Davis, Judge,
delivered tbe opinion of tbe court:
The only contested point in this suit for refund of income and excess profits taxes is the timeliness of plaintiff’s refund claim. The defendant does not deny that the taxes were overpaid, but it contends that recovery is now barred because the formal claim for refund came some months too late. We reject the defense and hold that plaintiff made a seasonable demand.
For the span of years beginning with 1941, plaintiff duly elected to use the “last in, first out” (“Lifo”) method of inventorying goods under Section 22(d) (“method of inventorying goods”) of the Internal Revenue Code of 1939; in particular, plaintiff chose to come under Section 22(d) (6), relating to the involuntary liquidation and replacement of inventory for the years from 1941 to 1948.[1] The general *109 scheme of this inventory system was that a taxpayer was entitled, in defined circumstances, to consider inventory lost or left unreplaced in those eight years because of “war condi *110 tions” — i.e., involuntarily liquidated — to bave been replaced in a subsequent taxable year (prior to 1953) by new goods, generally at higher cost. In that event, there was to be an exchange of costs between the liquidated and the replacement goods, and two tax adjustments would follow: (1) the income for the year of involuntary liquidation was to be decreased by the excess cost of replacement (the amount by which the cost of the replacement goods exceeded the cost of the liquidated goods) and the tax liability for that year redetermined;[2] and (2) the replacement goods were to be included in the purchases and inventory for the year of replacement at the inventory cost basis of the goods replaced.
In 1942, 1943, and 1945, plaintiff’s closing inventories of certain goods reflected a decrease, attributable to such “involuntary liquidation”, from its opening inventories for those years. Replacements of these involuntarily liquidated inventories were made in later years, including 1949, at excess costs. Plaintiff made the adjustments required by Section 22(d) (6) (A) and (C) for the years of liquidation and replacement ; it found itself entitled to refunds of income and excess profits taxes for 1942,1943, and 1945 (the liquidation years) on account of goods replaced in 1949 (the replacement year for this case).
Under the special provisions of Section 22(d) (6) (E) (see footnote 1, supra), if such adjustments for a liquidation year are prevented by the normal statute of limitations, the taxpayer is nevertheless allowed to take advantage of a favorable adjustment if a claim for refund is made within three years after the date of filing of its income tax return for the replacement year. Plaintiff filed its return for 1949 (the replacement year) on March 15,1950. In December 1952, the parties extended, by proper agreement, the time for the assessment of additional income taxes for 1949 to June 30, 1954; this agreement had the effect, under Section 322(b) (3) of the 1939 Code, of extending until December 31,1954, the time within which plaintiff could file claims for refund of its 1949 income taxes.
*111 Plaintiff did not file formal claims for refund of the over-payments of its taxes for 1942,1943, and 1945 (resulting from its excess cost of replacement in 1949) until May 1953 and January 1954 — more than three years after March 15, 1950. In 1958, these claims were finally rejected by the Internal Revenue Service as untimely.
This conclusion is attacked on alternative grounds.[3] One is that the formal refund claims for 191$, 191$, and 191$ were covered by the agreed extension of time to December 31, 1954, for filing refund claims for 191$ taxes. That agreement, which was made under Section 276(b)[4], operated under Section 322(b) (3)[5] to postpone to the end of 1954 the time within which plaintiff could file its refund claims for 1949 taxes. There is no explicit qualification comparable to Section 322(b) (3) in Section 22(d) (6) (E) (footnote 1, supra), which establishes the period for seeking refunds for liqui *112 dation years; the latter simply provides that if the adjustments to be made in the tax for the liquidation years are barred by the time of the replacement year the taxpayer’s period for filing the refund claim will be extended to “three years after the date of the filing of the income tax return for the year of replacement.” It is appropriate, however, to imply the condition that, if the parties prolong the time for filing refund claims for the replacement year beyond the statutory three-year period, the date for refund claims for the liquidation year will also be stretched to the same extent.
The reason why it is sound to add this qualification to the bare words of the Code is that a refund under Section 22(d) (6) for the liquidation year is intimately linked, in practice and by the statute, to the return and the tax for the replacement year. The right to an adjustment for the earlier period cannot arise until the replacements are made; the existence and amount of the permissible adjustment depend upon the aggregate replacement cost, as accepted for tax purposes; if that replacement cost should be altered (e.y., as a result of a Revenue Service audit) the adjustments for the liquidation years could well be affected (in addition to the tax for the replacement year itself). Congress recognized this close, almost inseparable, relationship by fixing the time for filing refund claims for the liquidation year[6] as the same three-year period during which the taxpayer could demand refunds for the replacement year (under Section 322(b) (1)) and the Internal Revenue Service could assess additional taxes for that year (under Section 275(a)). Where that three-year period has been extended for the taxes of the replacement year, it is sensible to prolong it, also, for refunds and deficiency assessments for the liquidation year. Otherwise it might not be possible to take account for the earlier period of a change in the figures for the replacement year made, for instance, as a result of a Government audit of the later return which was conducted within the extended period but after the original three years. There is a reciprocal connection between the two years — liquidation and re *113 placement — which calls for coordination between their respective limitation periods.
Defendant’s stark reply is that Congress did not so provide and we are powerless to fill the gap. Congress did not say so in terms, but we are given no reason why it would have wished to confine the refund or assessment period for the liquidation year to three years, even though the similar period for the necessarily-related replacement year had been extended.[7] Where all the pertinent considerations push toward a single goal and only the literal words of the legislation seem to bar the way, it is proper to search hard for an opening through which to pass along the indicated road. We think that such an opening exists in this case. The form of words may have been awkwardly chosen, but when Section 22(d) (6) (E) makes a refund claim or deficiency assessment for the liquidation year timely if made “within three years after the date of the filing of the income tax return for the year of replacement” — the ordinary period for further assessments or refund claims for the year of replacement — it is quite possible to understand Congress as designating nothing less than the full period prescribed by Section 275 (a), 276 (b) and 322(b) (1) and (3) (footnotes 4, 5, supra,) for filing a refund claim or levying a deficiency for the replacement year. The reference to the normal three-year span could well stand, elliptically, for its appendages as well. We take it that that is what the statute means, and therefore hold that plaintiff’s formal refund claims were timely.
An independent basis for deciding that plaintiff is not barred is that it made a timely informal claim for refunds for the liquidation years (1942,1943, and 1945) within three calendar years of the filing of its tax return for 1949 (the year of replacement). Informal refund claims have long been held valid (United States v. Kales, 314 U.S. 186 (1941), and cases cited). But they must have a written component (Sicanoff Vegetable Oil Corp. v. United States, 149 Ct. Cl. 278, 286, 181 F. Supp. 265 (1960); Wrightsman Petroleum Co. v. United States, 92 Ct. Cl. 217, 238, 35 F. Supp. 86, 96 (1940), cert. denied, 313 U.S. 578 (1941)), and should ade *114 quately apprise the Internal Revenue Service that a refund is sought and for certain years. Newport Industries, Inc. v. United States, 104 Ct. Cl. 38, 60 F. Supp. 229 (1945); Rosengarten v. United States, 149 Ct. Cl. 287, 293-94, 181 F. Supp. 275, 278-79 (1960), cert. denied, 364 U.S. 822; Newton v. United States, 143 Ct. Cl. 293, 300, 163 F. Supp. 614, 619 (1958); Sweeney v. United States, 152 Ct. Cl. 616, 520 (1961), 285 F. 2d 444, 446; Philipsborn v. United States, 72 Ct. Cl. 545, 554-55, 53 F. 2d 133, 138-39 (1931), cert. denied, 285 U.S. 548 (1932). It is not enough that the Service have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; nor is it sufficient that a claim involving the same ground has been filed for another year or by a different taxpayer. Rosengarten v. United States, supra; Byron Weston Co. v. United States, 115 Ct. Cl. 232, 234-35, 87 F. Supp. 955, 956-57 (1950). On the other hand, the writing should not be given a crabbed or literal reading, ignoring all the surrounding circumstances which give it body and content. The focus is on the claim as a whole, not merely the written component. See Newton v. United States, supra, 143 Ct. Cl. at 300, 163 F. Supp. at 619 (1958); Higginson v. United States, 113 Ct. Cl. 131, 157-58, 81 F. Supp. 254, 267-68 (1948). In addition to the writing and some form of request for a refund, the only essential is that there be made available sufficient information as to the tax and the year to enable the Internal Revenue Service to commence, if it wishes, an examination into' the claim.
Under these standards, and in the light of the particular circumstances, this court has found informal refund claims based upon an objection on the back of a check paying the tax (Night Hawk Leasing Co. v. United States, 84 Ct. Cl. 596, 18 F. Supp. 938 (1937)) ; written protests prior to payment (Newton v. United States, supra); a letter of transmittal accompanied by an executed waiver of restrictions on assessment (Cumberland Portland Cement Co. v. United States, 122 Ct. Cl. 580, 591-92, 104 F. Supp. 1010 (1952)); and on an executed waiver subject to special conditions (Stuart v. United States, 131 Ct. Cl. 174, 130 F. Supp. 386 *115 (1955)). See, also, Crenshaw v. Hrcka, 237 F. 2d 372 (C.A. 4, 1956), affirming 140 F. Supp. 350 (E.D. Va., 1956) (letter agreeing to installment plan for paying taxes); and Neilson v. Harrison, 131 F. 2d 205 (C.A. 7, 1942) (conditional waiver).
On what can our plaintiff rely to demonstrate that it made an informal claim prior to March 15,1953 “within three years after the date of the filing of the income tax return for the year of replacement”) % The chief written component consisted of various notations and figures on its income tax return for 1949. One schedule of that return listed an item of $750,000 as “Estimated Refund Federal Taxes — Re: ‘Lifo’ Inventory”; another schedule listed the sum of $965,-193.72 for “Excess Cost of Replacements — Re: ‘Lifo’ Inventory” ; and still another schedule indicated that the increase during 1949 in “Federal Taxes Refundable” was $750,000 (the same figure as the taxes refundable “Re ‘Lifo’ Inventory”). These parts of the return were sufficient to satisfy the requirement that there be a written element in the informal demand. If there were nothing else, perhaps these notations would not have been adequate by themselves to create a valid informal claim, but with their explicit references to tax refunds, “Lifo” inventory, and excess cost of replacements they certainly supplied enough of an underpinning.[8]
For the rest, plaintiff can properly rely on the very specific knowledge gained by the revenue agent in auditing its returns for 1949 and 1950. This agent was thoroughly familiar with plaintiff’s tax problems; he audited its returns for each year prior to 1949, beginning with 1940 or 1941. Significantly, he completed his audit of 1942, 1943, and 1945 (the liquidation years for which refunds are now sought) before March 15, 1953; he likewise finished his audit of 1949 and 1950 and made his reports before that critical date. Our detailed findings show that, in the course of his thorough examination of the 1949 and 1950 returns, the agent clearly came to know that plaintiff had had involuntary liquidations in 1942,1943, and 1945 (among other years); that it had elected to come *116 under Section 22(d) (6) of the 1939 Code for those years; and that it believed itself entitled to, and expected, a certain sum in refunds for those (and other) years on account of replacements made in 1949. The agent’s reports of his examination of the 1949 and I960 returns plainly revealed, in computations and breakdown of items, his recognition that plaintiff affirmatively anticipated such refunds. Headings in both reports referred expressly to expected refunds for earlier years due to replacements in 1949; the agent also made adjustments in the 1950 tax which were affected by his acceptance of these anticipated refunds. In addition, he thought that formal refund claims would be filed and that he would consider them. There can therefore be no doubt that, before the expiration of the three-year period, a responsible employee of the Internal Revenue Service had “notice fairly advising the Commissioner of the nature of the taxpayer’s claim.” United States v. Kales, supra, 314 U.S. at 194.
The defendant objects that this informal claim — reflected in plaintiff’s returns for 1949 and 1950, taken together with the revenue agent’s knowledge — did not give the Service such important prerequisites as the years for, or the amounts in, which the refunds were being sought, or the costs of the various inventories for each year. However, the Trial Commissioner has found that, by the time the agent had concluded his audits, he knew (i) that plaintiff desired refunds resulting from 1949 replacements of involuntary liquidations in 1942-1947; (ii) the approximate total amount of the refund expected, and (iii) the aggregate excess cost of the 1949 replacements. The testimony and the documentary evidence support these findings, and we adopt them. In sufficient degree, the agent had before him the very elements defendant says were missing; plaintiff was not required, for this informal claim for refunds all of one type, to match particular amounts to particular years, or to point out that this claim related only to 1942, 1943, and 1945 (not to 1944, 1946 or 1947).[9] An informal claim which is partially informative *117 may be treated as valid even though “too general” or suffering from a “lack of specificity” — at least where those defects have been remedied by a formal claim filed after the lapse of the statutory period but before the rejection of the informal request. United States v. Kales, supra, 314 U.S. at 194. Plaintiff’s formal refund claims (in May 1953 and January 1954) were admittedly complete and they were filed well before the rejections of all claims in 1955 and 1958. Any irregularities in the informal claim were thus cured retroactively. United States v. Memphis Cotton Oil Co., 288 U.S. 62, 71-72 (1933); United States v. Kales, supra; Jones v. United States, 78 Ct. Cl. 549, 557, 5 F. Supp. 146, 150 (1933), cert. denied, 293 U.S. 566 (1934); Higginson v. United States, supra, 113 Ct. Cl. 131, 158, 81 F. Supp. 254, 268 (1948); Cumberland Portland Cement Co. v. United States, supra, 122 Ct. Cl. 580, 593-94, 104 F. Supp. 1010, 1015 (1952); Newton v. United States, supra, 143 Ct. Cl. 293, 301, 163 F. Supp. 614, 619 (1958); Rosengarten v. United States, supra, 149 Ct. Cl. 287, 293, 181 F. Supp. 275, 278-79 (1960), cert. denied, 364 U.S. 822; Hrcka v. Crenshaw, supra, 140 F. Supp. 350, 352-53 (E.D. Va., 1956), aff’d 237 F. 2d 372 (C.A. 4, 1956). It is irrelevant that the formal demands did not refer to the informal claim and were not designated as amendments. Whatever the nomenclature, they supplied the missing information before the Revenue Service had rejected the informal claim, and were therefore equivalent to amendments in substance.
None of this court’s earlier decisions is inconsistent with our holding that plaintiff made a valid informal claim before March 15, 1953. Defendant cites Rosengarten v. United States, supra, 149 Ct. Cl. at 294, 181 F. Supp. at 279 (1960), and Sicanoff Vegetable Oil Corp. v. United States, supra, 149 Ct. Cl. at 286, 181 F. Supp. at 269 (1960), but neither case is at loggerheads with what we decide today. Bosengarten involved a claim by another taxpayer for a different year; Sicanoff involved an alleged informal claim based solely on oral conversations with a revenue agent and without any written component. Nor do we know of any conflicting ruling by any other court. The closest is Tobin v. Tomlin *118 son, 310 F. 2d 648 (C.A. 5, 1962), but in that case there was no showing (so far as appears) that the Internal Revenue Service had, before the lapse of the limitations period, detailed information of the kind which was known to the agent here before March 15,1953; moreover, the alleged informal claim was rejected there before the filing of the belated formal claim.
On both grounds, we conclude that the plaintiff made a timely refund claim and is entitled to recover. Judgment is entered to that effect. The amount of recovery will be determined under Rule 38 (c) .[10]
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is a Delaware corporation. Its principal executive office is located at 40 West 40th Street, New York, New York. It brings this action in its own right.
■2. On May 15, 1942, plaintiff filed with its tax return for 1941 a valid election to use the “last in, first out” (“LIFO”) method of inventorying goods under section 22(d) of the Internal Revenue Code of 1939.
3. On or about May 15, 1943, plaintiff timely filed its corporation income and declared value excess profits tax return and its corporation excess profits tax return for 1942 with the Collector of Internal Revenue for the Third District of New York. Said returns reported an income tax liability of $2,350,527.21 and no excess profits tax liability.
4. The following amounts were paid by plaintiff to the Collector of Internal Revenue in respect of income taxes shown to be due on plaintiff’s 1942 return: on or about March 15,1943, $638,556; on or about June 15,1943, $536,707.61; on or about September 15,1943, $587,631.80; on or about December 14,1943, $587,631.80.
*119 5. Refunds in respect of income taxes for 1942 were allowed to plaintiff in the aggregate amount of $1,433,591.52, together with $12,427.72 of interest. These amounts were paid to plaintiff as follows: on or about February 7, 1947, $46,988.22; or or about December 23, 1948, $70,243.31; on or about May 16, 1951, $1,032,126.31; on or about October 15, 1958, $296,235.07; on or about October 6,1959, $426.33.
6. Taking into account the aforementioned refunds, plaintiff has paid a total of $916,935.69 in respect of income taxes for 1942, no part of which has been refunded to plaintiff.
7. Plaintiff duly filed with its returns for 1942 an election, under section 22(d) (6) (A), to have the provisions of section 22(d) (6) apply to its LIFO inventories in respect of the year 1942.
8. (a) Plaintiff’s closing inventory of Regular Radiation Products at the end of 1942 reflected a decrease from the opening inventory at the beginning of 1942 of $693,003.94. This decrease was attributable to involuntary liquidation as defined in section 22(d) (6) (B).
(b) Plaintiff’s closing inventory of Enameled Cast Iron Products at the end of 1942 reflected a decrease from the opening inventory at the beginning of 1942 of $1,065,239.09. This decrease was attributable to involuntary liquidation as defined in section 22 (d)(6)(B).
(c) Plaintiff’s closing inventory of Manganese at the end of 1942 reflected a decrease from the opening inventory at the beginning of 1942 of $3,837.59. This decrease was attributable to involuntary liquidation as defined in section 22(d)(6)(B).
(d) Plaintiff’s closing inventory of Tin Oxide at the end of 1942 reflected a decrease from the opening inventory at the beginning of 1942 of $45,748.50. This decrease was attributable to involuntary liquidation as defined in section 22(d)(6)(B).
9. (a) Replacements of inventory of Regular Radiation Products involuntarily liquidated in 1942 were made in 1949 at a cost of $189,732.99 and in 1951 at a cost of $844,340.76.
(b) Replacements of the inventory of Enameled Cast Iron Products involuntarily liquidated in 1942 were made in 1948 *120 at a cost of $1,123,907.16, in 1949 at a cost of $747,619.40, and in 1951 at a cost of $385,343.25.
(c) Replacements of the inventory of Manganese involuntarily liquidated in 1942 were made in 1944 at a cost of $1,463.47, in 1945 at a cost of $721.67, and in 1952 at a cost of $1,479.77.
(d) Replacements of the inventory of Tin Oxide involuntarily liquidated in 1942 were made in 1946 at a cost of $5,502.36, in 1947 at a cost of $3,029.51, in 1948 at a cost of $10,076.73, in 1950 at a cost of $1,418.06, and in 1952 at a cost of $411.14.
10. Pursuant to section 22(d)(6)(C) and the election made by plaintiff under section 22(d)(6)(A), the above replacements were treated as having been acquired in replacement of the goods most recently liquidated and not previously replaced and were included in plaintiff’s closing inventory for the years of replacement at the inventory cost basis of the goods replaced'.
11. Refunds due plaintiff in respect of 1942 attributable to the excess cost of replacements made in years before and after 1949 of inventory involuntarily liquidated in 1942 have been claimed by and paid to plaintiff.
12. The excess of cost of replacements in 1949 of the inventory involuntarily liquidated in 1942 was $501,309.67. Of this amount, $105,842.60 represents the excess cost of replacements of Regular Radiation Products and $395,467.07 represents the excess cost of replacements of Enameled Cast Iron Products.
13. On or about May 15, 1944, plaintiff timely filed its corporation income and declared value excess profits tax return and its corporation excess profits tax return for 1943 with the Collector of Internal Revenue for the Third District of New York. Said returns reported an income tax liability of $2,276,828.31 and an excess profits tax liability of $1,836,796.47.
14. The following amounts were paid by plaintiff to the Collector of Internal Revenue in respect of income and excess profits taxes shown to be due on plaintiff’s 1943 returns: on or about March 15, 1944, $570,000 of income taxes and *121 $479,294 of excess profits taxes; on or about June 15, 1944, $528,224.39 of income taxes and $479,924 of excess profits taxes; on or about September 14,1944, $150,197.73 of income taxes and $878,208.47 of excess profits taxes; on or about December 13,1944, $1,028,406.19 of income taxes.
15. Deficiencies in respect of income taxes for 1943 were assessed against and paid by plaintiff in the aggregate amount of $367,896, together with $41,482.47 of interest. These amounts were paid by plaintiff by crediting them against an equal amount of refunds allowed plaintiff in respect of 1943.
16. Eefunds in respect of income and excess profits taxes for 1943 were allowed to plaintiff in the aggregate amounts of $34,976.68 of income taxes and $1,836,796.47 of excess profits taxes, together with $80,729.69 of interest. These amounts were paid to plaintiff as follows: on or about May 23, 1946, $28,987.72; on or about September 13, 1950, $623,033.49; on or about May 16, 1951, $873,460.24; on or about October 15, 1958, $16,699.88; on or about October 6, 1959, $943.04. The remaining amount, $409,378.47, was credited against an equal amount of deficiencies assessed against plaintiff in respect of 1943.
17. Taking into account the aforementioned deficiencies and refunds, plaintiff has paid a total of $2,609,747.63 in respect of income taxes for 1943, no part of which has been refunded to plaintiff.
18. Plaintiff duly filed with its returns for 1943 an election, under section 22(d) (6) (A), to have the provisions of section 22(d) (6) apply to its LIFO inventories in respect of the year 1943.
19. (a) Plaintiff’s closing inventory of Regular Radiation Products at the end of 1943 reflected a decrease from the opening inventory at the beginning of 1943 of $140,465.52. This decrease was attributable to involuntary liquidation as defined in section 22(d) (6) (B).
(b) Plaintiff’s closing inventory of Enameled Cast Iron Products at the end of 1943 reflected a decrease from the opening inventory at the beginning of 1943 of $444,189.65. This decrease was attributable to involuntary liquidation as defined in section 22 (d) (6) (B).
*122 (c) Plaintiff’s closing inventory of Vitreous China Products at the end of 1943 reflected a decrease from the opening inventory at the beginning of 1943 of $133,671.01. This decrease was attributable to involuntary liquidation as defined in section 22(d) (6) (B).
(d) Plaintiff’s closing inventory of Wirebound Crates at the end of 1943 reflected a decrease from the opening inventory at the beginning of 1943 of $21,713.05. This decrease was attributable to involuntary liquidation as defined in section 22(d) (6) (B).
20. (a) Eeplacements of the inventory of Eegular Eadiation Products involuntarily liquidated in 1943 were made in 1949 at a cost of $317,687.66.
(b) Eeplacements of the inventory of Enameled Cast Iron Products involuntarily liquidated in 1943 were made in 1944 at a cost of $55,814.68, in 1945 at a cost of $299,311.74, in 1946 at a cost of $56,304.67, in 1947 at a cost of $264,415.88, and in 1948 at a cost of $180,666.09.
(c) Eeplacements of the inventory of Vitreous China Products involuntarily liquidated in 1943 were made in 1944 at a cost of $167,973.43.
(d) Eeplacements of the inventory of Wirebound Crates involuntarily liquidated in 1943 were made in 1945 at a cost of $17,200.13, in 1947 at a cost of $14,511.25, and in 1952 at a cost of $3,835.60.
21. Pursuant to section 22(d) (6) (C) and the election made by plaintiff under section 22(d) (6) (A), the above replacements were treated as having been acquired in replacement of the goods most recently liquidated and not previously replaced and were included in plaintiff’s closing inventory for the years of replacement at the inventory cost basis of the goods replaced.
22. Eefuhds due plaintiff in respect of 1943 attributable to the excess cost of replacements made in years before and after 1949 of inventory involuntarily liquidated in 1943 have been claimed by and paid to plaintiff.
23. The excess cost of replacements in 1949 of the inventory involuntarily liquidated in 1943 was $177,222.14, all attributable to the excess cost of replacements of Eegular Eadiation Products.
*123 24. On or about March 14, 1946, plaintiff timely filed its corporation income and declared value excess profits tax return and its corporation excess profits tax return for 1945 with the Collector of Internal Revenue for the Third District of New York. Said returns reported an income tax liability of $2,394,036.05 and excess profits tax liability of $2,780,452.55.
25. The following amounts were paid by plaintiff to the Collector of Internal Revenue in respect of income taxes and excess profits taxes shown to be due on plaintiff’s 1945 returns: on or about March 14, 1946, $598,509.01 of income taxes and $695,113.14 of excess profits taxes; on or about June 13, 1946, $598,509.01 of income taxes and $695,113.14 of excess profits taxes; on or about September 13, 1946, $598,509.01 of income taxes and $695,113.14 of excess profits taxes; on or about December 13,1946, $598,509.02 of income taxes and $695,113.13 of excess profits taxes.
26. Deficiencies in respect of income taxes for 1945 were assessed against and paid by plaintiff in the aggregate amount of $420,867.36, together with $87,219.95 of interest thereon. These amounts were paid by plaintiff as follows: on or about April 27, 1951, by credit against an equal amount of refunds allowed plaintiff in respect of 1945, $14,444.70; on or about June 12, 1952, by credit against an equal amount of refunds allowed plaintiff in respect of 1944, $493,642.61.
27. Refunds in respect of income and excess profits taxes for 1945 were claimed by and paid to plaintiff in the aggregate amounts of $2,612.14 of income taxes and $1,024,403.81 of excess profits taxes, together with $217,169.49 of interest thereon. These amounts were paid to plaintiff as follows: on or about July 9, 1951, $72,372.35; on or about April 29, 1953, $284,724.35; on or about May 19, 1953, $789,291.61; on or about October 15, 1958, $83,352.43. The remaining amount, $14,444.70, was credited' against an equal amount of deficiencies assessed against plaintiff in respect of 1945.
28. Taking into account the aforementioned deficiencies and refunds, plaintiff has paid a total of $2,812,291.27 in respect of income taxes and $1,756,048.74 in respect of excess profits taxes for 1945, no part of which has been refunded to plaintiff.
*124 29. Plaintiff duly filed with its return for 1945 an election, under section 22(d) (6) (A) to have the provisions of section 22(d) (6) apply to its LIFO inventories in respect of the year 1945.
30. (a) Plaintiff’s closing inventory of Regular Radiation Products at the end of 1945 reflected a decrease from the opening inventory at the beginning of 1945 of $33,673.83. This decrease was attributable to involuntary liquidation as defined in section 22(d) (6) (B).
(b) Plaintiff’s closing inventory of Yitreous China Products at the end of 1945 reflected a decrease from the opening-inventory at the beginning of 1945 of $657,543.40. This decrease was attributable to involuntary liquidation as defined in section 22(d) (6) (B).
31. (a) Replacements of the inventory of Regular Radiation Products involuntarily liquidated in 1945 were made in 1947 at a cost of $40,712.99 and in 1948 at a cost of $31,945.39.
(b) Replacements of the inventory of Yitreous China Products involuntarily liquidated in 1945 were made in 1948 at a cost of $137,404.13, in 1949 at a cost of $534,782.53, and in 1950 at a cost of $361,352.38.
32. Pursuant to section 22(d) (6) (C) and the election made by plaintiff under section 22(d)(6)(A), the above replacements were treated as having been acquired in replacement of the goods most recently liquidated and not previously replaced and were included in plaintiff’s closing inventory for the years of replacement at the inventory cost basis of the goods replaced.
33. Refunds due plaintiff in respect of 1945 attributable to the excess cost of replacements made in years before and after 1949 of inventory involuntarily liquidated in 1945 have been claimed by and paid to plaintiff.
34. The excess cost of replacements in 1949 of the inventory involuntarily liquidated in 1945 was $225,659.68, all attributable to the excess cost of replacements of Yitreous China Products.
35. Section 22(d) (6) (A)-(E) applied, in the case of plaintiff, only to the involuntary liquidation of LIFO inventories in the years 1941-1947. Plaintiff had involuntary liquidations in its LIFO inventories in each of said *125 years and filed elections under section 22(d) (6) (A) to have tbe provisions of section 22(d) (6) apply in respect of each of said years.
36. Plaintiff’s corporation income tax return for 1949 (“1949 return”) was timely filed with the Collector of Internal Eevenue for the Third District of New York on March 15, 1950. The return was accompanied by a forwarding letter which identified the return and the schedules and forms attached thereto. No reference is made in the letter to a claim for refund.
37. (a) The item of $29,303,844.41, “Inventory at end of year,” in “Schedule A — Cost of Goods Sold” of plaintiff’s 1949 return included (but did not separately identify) an adjustment in the amount of $965,193.72 for the excess cost of replacements during 1949 of inventories involuntarily liquidated in prior years.
(b) An item of $965,193.72, designated “Excess Cost of Eeplacements — Ee: ‘Lifo’ Inventory,” did appear, however, in a schedule attached to plaintiff’s 1949 return as an explanation of “Other Unallowable Deductions” in “Schedule M— Eeconciliation of Net Income and Analysis of Earned Surplus and Undivided Profits.”
(c) The excess cost of replacements referred to in plaintiff’s 1949 return related to inventories which were involuntarily liquidated in the years and replaced at excess costs as follows:
1947- $6,032. 55
1945- 225, 659. 68
1944- 54, 969. 68
1943- 177,222.14
1942- 501,309. 67
965,193. 72
This breakdown or analysis of the $965,193.72 total was not disclosed in plaintiff’s 1949 return.
38.(a) On “Schedule L — Balance Sheets” of plaintiff’s 1949 return, there was included among plaintiff’s assets an item designated “Federal Taxes Eefundable,” which consisted entirely of estimated refunds for several earlier years resulting from subsequent replacements of inventories involuntarily liquidated in, the earlier years. The amount of *126 said refunds shown on said schedule at the beginning of 1949 was $4,700,144.11, and at the end of 1949 was $5,450,144.11. The difference of $750,000 was the estimated amount of refunds resulting from the excess cost of replacements in 1949 of $965,193.72.
(b) A schedule attached to plaintiff’s 1949 return explaining “Other Nontaxable Income” in schedule M of said return included an item designated “Estimated Refund Federal Taxes — Re: ‘Lifo’ Inventory, $750,000.00.” This item represented the estimated amount of refunds expected by plaintiff as a result of the excess cost of replacements in 1949 of $965,193.72.
39. Plaintiff’s 1949 return was audited by an agent of the Internal Revenue Service before August 11,1952.
40. The revenue agent who audited plaintiff’s 1949 return had audited plaintiff’s Federal income and excess profits tax returns for each year prior to 1949 beginning with 1940 or 1941.
,41. The revenue agent who audited plaintiff’s 1949 return had audited plaintiff’s returns for 1942,1943, and 1945 prior to March 15,1953.
42. At the time of his audit, the revenue agent who audited plaintiff’s 1949 return knew from his audit of previous returns of plaintiff that plaintiff had experienced involuntary liquidations of inventories in 1942, 1943, and 1945, among other years, and that plaintiff had filed with its returns for each of said years an election to have the provisions of section 22 (d) (6) apply.
43. The agent who audited plaintiff’s 1949 return examined, probably before March 15, 1953, claims for refund filed by plaintiff for 1942,1943, and 1945, among other years, arising from replacements in 1946,1947, and 1948 of inventories that were involuntarily liquidated in 1942, 1943, and 1945.
44. In the course of his audit of plaintiff’s 1949 return, the revenue agent examined “Schedule A — Cost of Goods Sold,” referred to in paragraph 37(a), and determined that during 1949 there had been replacements of involuntarily liquidated inventories.
45. In examining schedule A, the revenue agent examined plaintiff’s computation of the item “Inventory at end of *127 year, which included as a separate item an adjustment of $965,193.72 for the excess cost of replacements of involuntarily liquidated inventory. The amount of the adjustment did not affect the plaintiff’s tax liability for 1949 and the revenue agent accepted it as correct without making any independent calculation.
46. In the course of his audit of plaintiff’s 1949 return, the revenue agent examined the item “Excess Cost of Ee-placements — Ee: ‘Lifo’ Inventory” referred to in paragraph 37 (b), and accepted the amount of $965,193.72 as correct, without verifying it, knowing that the computation of the amount depended upon the years to which the replacements related, the cost of the inventories that were involuntarily liquidated in those years, and the cost of the replacements of said inventories, but that the amount of this item did not affect plaintiff’s tax liability for 1949.
47. In the course of his audit of plaintiff’s 1949 return, the revenue agent examined the item “Federal Taxes Ee-fundable” referred to in paragraph 38(a). He knew that it consisted of the company’s estimate of claims for refunds resulting from replacements of involuntarily liquidated inventories, but, inasmuch as the accuracy of such estimate had no bearing on income tax liability for the year, he did not spend much time verifying its accuracy.
48. In the course of his audit of plaintiff’s 1949 return, the revenue agent examined and accepted, without verification of the amount, the item “Estimated Eefund Federal Taxes — Re: 'Lifo’ Inventory, $750,000.00” referred to in paragraph 38(b). He knew that this item, which had no bearing on plaintiff’s tax liability for 1949, and also the difference of $750,000 between “Federal Taxes Eefundable” at the beginning of 1949 and at the end of 1949 on schedule L, represented the amount estimated by plaintiff to be refundable as a result of replacements during 1949 of inventories involuntarily liquidated in several previous years which the item did not separately identify.
49. (a) Upon completion of his audit of plaintiff’s 1949 return, the revenue agent prepared a report of his examination dated August 11, 1952. Said report was the official re *128 port of tbe Internal Bevenne Service concerning plaintiff’s 1949 return.
(b) “Exhibit A — Analysis of Surplus” contained in said report included, under the heading “Other unallowable deductions,” an item designated “Excess cost of replacements— re ‘lifo’ inventory, 1949, per return $965,193.72, amended $965,193.72.”
(c) Said exhibit A included under the heading “Other nontaxable income” an item designated “Estimated refund, federal taxes — re ‘lifo’ inventory, 1949, per return $750,000.00, amended $750,000.00.”
(d) The revenue agent accepted as correct the figures used by plaintiff and so indicated in the report by including in the column entitled “amended” the same figures as were in the column entitled “per return.”
(e) Other than the references described in findings 49(b) and 49(c) to “Excess cost of replacements — re ‘lifo’ inventory, 1949” and “Estimated refund, federal taxes — re ‘lifo’ inventory, 1949,” the report contains no reference to any present or potential expectation or claim of refund.
50. Upon completion of his audit of plaintiff’s 1949 return prior to March 15, 1953, the revenue agent knew that involuntary liquidations had occurred in the years 1942, 1943, and 1945, among others, that plaintiff believed it was entitled to refunds estimated at $750,000 for the years 1942-1947, and that the basis for plaintiff’s expectation of refunds was the estimated excess cost of replacements in 1949 in the amount of $965,193.72 of inventories that were involuntarily liquidated in those years. He had not, however, formally oriented the aggregate amount of the estimates to the several years in which involuntary liquidations had occurred.
51. On or about December 19,1952, plaintiff and the Commissioner of Internal Bevenue executed a timely consent on Treasury Department Form 872, which extended to June 30, 1954, the time within which the Commissioner could assess additional income taxes for 1949 and which by operation of law extended to December 31, 1954, the time within which claims for refund of income taxes for 1949 could be filed by plaintiff.
*129 52. Plaintiff’s corporation income tax return for 1950 (“1950 return”) was timely filed with the Collector of Internal Revenue for the Third District of New York on March 15,1951. The return was accompanied by a forwarding letter which identified the return and the schedules and forms attached thereto. No reference is made in the letter to a claim for refund.
53. On “Schedule A — Cost of Goods Sold” on plaintiff’s 1950 return, the amount entered under the item “Inventory at beginning of year” was the same as the amount that was entered mider “Inventory at end of year” on plaintiff’s 1949 return. That amount had been adjusted in the 1949 return by $965,193.72 for the excess cost of replacements during 1949 of involuntarily liquidated inventories.
54. On “Schedule L — Balance Sheets” of plaintiff’s 1950 return, the amount entered under the item “Federal Taxes Refundable” for the beginning of 1950 was the same as the amount that was entered in the 1949 return for the end of 1949. That amount included, although it did not separately identify, $750,000 of estimated refunds resulting from the 1949 replacements of involuntarily liquidated inventories.
55. (a) “Schedule EP-2(A) — Base Period Capital Addition” on plaintiff’s 1950 return was used in the computation of plaintiff’s excess profits tax for 1950. Said schedule included items designated “Total assets at beginning of year,” “Equity capital at beginning of year,” “Yearly base period capital,” and “Base period capital addition.”
(b) The amount entered under “Total assets at beginning of year” for 1950 on said schedule EP-2(A) (under the column entitled “First Taxable Year Ending After June 30, 1950”) included all Federal tax refunds anticipated by plaintiff as a result of the excess cost of replacements of involuntarily liquidated inventories, and included specifically $822,375.18 of refunds on account of replacements in 1949.
(c) The amount of $822,375.18 was the exact amount of refunds anticipated by plaintiff on account of the 1949 replacements at the time plaintiff’s 1950 return was filed and is comparable with the estimated amount of $750,000 included in the 1949 return.
*130 56. Plaintiff’s 1950 return was audited by an agent of the Internal Revenue Service before February 20,1953.
57. Plaintiff’s 1950 return was audited by the same revenue agent who audited its 1949 return.
58. In the course of his audit of plaintiff’s 1950 return, the revenue agent examined “Schedule A — Cost of Goods Sold” referred to in paragraph 53 and verified that the amount entered under “Inventory at beginning of year” corresponded with the amount entered under “Inventory at end of year” on plaintiff’s 1949 return. The revenue agent accepted that amount as correct, knowing that it had been adjusted by $965,193.72 to reflect the excess cost of replacements in 1949 of involuntarily liquidated inventories.
59. The adjustment of $965,193.72 did not affect plaintiff’s tax liability for 1949 since it reduced purchases as well as closing inventories for that year, but its inclusion in plaintiff’s opening inventories for 1950 served to increase its tax liability for 1950 to the extent that the replacements were sold in 1950. In reliance upon his confidence in the plaintiff’s method of keeping its inventory records, bom of experience in the course of numerous careful examinations, the revenue agent accepted as correct, although he did not know of his own knowledge, a statement by an official of the plaintiff that approximately three-fourths of the 1949 replacements were sold in 1950. Plaintiff’s tax liability for 1950 would have been less if its opening inventories for 1950 had not been adjusted by $965,193.72 for the excess cost of replacements in 1949.
60. In the course of his audit of plaintiff’s 1950 return, the revenue agent examined the item “Federal Taxes Refundable” referred to in paragraph 54, verified that the amount listed for the beginning of 1950 corresponded with the amount listed in the 1949 return for the end of 1949, and knew that the amount included $750,000 of estimated refunds for 1942-1947 based upon replacements in 1949 of inventories that were involuntarily liquidated in those years.
61. (a) In the course of his audit of plaintiff’s 1950 return, the revenue agent examined “Schedule EP-2(A)— Base Period Capital Addition” referred to in paragraph 55, *131 knowing that it directly affected the computation of plaintiff’s excess profits tax for 1950.
(b) The revenue agent noted that the amount shown on schedule EP-2 (A) as “Total assets at beginning of year” for 1950 differed from the amount shown on schedule L as “Total Assets” at the beginning of 1950, and requested a reconciliation of such difference from plaintiff.
(c) The revenue agent received from plaintiff a schedule showing such reconciliation on October 31, 1952, and used said schedule in the preparation of his report covering the audit.
(d) The revenue agent recognized that “total assets” at the beginning of 1950 in both schedule EP-2 (A) and schedule L included Federal taxes refundable, that the amount of Federal taxes refundable included in schedule EP-2 (A) differed from the amount shown in schedule L, and that the difference was accounted for in the reconciliation schedule.
(e) The reconciliation schedule showed under the heading “LIFO Refunds — Gross Refund” that Federal taxes refundable on account of the excess cost of replacements of involuntarily liquidated inventories were $4,671,951.11 at the end of 1948 and $5,494,326.29 at the end of 1949; the difference between these amounts, which represented refunds arising from replacements in 1949, was $822,375.18. The reconciliation schedule did not show the years for which LIFO refunds were thought to be due.
(f) The revenue agent accepted as correct plaintiff’s reconciliation of the difference between the totals of Federal taxes refundable in schedule L and in schedule EP-2 (A) without making a detailed verification or determining severally the years for which the taxes were deemed to be refundable.
62. (a) In his report dated February 20, 1953, covering the audit of plaintiff’s 1950 return, the revenue agent made changes in the computation of plaintiff’s base period capital addition. During the course of his audit of the 1950 return, a representative of the plaintiff supplied to the revenue agent a schedule showing certain changes to be made in the computation of the base period capital addition. The revenue agent incorporated the changes indicated on this schedule *132 in bis report. Tlieir effect was to decrease tbe base period capital addition from $11,039,126.35 shown on the return to $10,868,409.92.
(b) These changes were set out in “Schedule 7 — -Adjustments to Yearly Base Period Capital Addition” attached to the report. That schedule disclosed the following increases and decreases of the amomit shown on plaintiff’s 1950 return as “Yearly base period capital” at the beginning of 1950:
(1) Increases entitled “Overassessments of federal income and excess profits taxes: 1944-1945 (per RAR dated 4/8/52), $1,103,232.85; 1948 (per RAR dated 8/11/52), $20,108.19; 1949 (per RAR dated 8/11/52), $24,031.03.”
(2) Decrease entitled “Federal income tax deficiency for 1947 (per RAR. dated 5/13/52), $10,785.24.”
(3) Decrease entitled “Adjustment of accrual for federal income tax refundable on account of replacements in 1949 of inventory involuntarily liquidated in preceding years, for which claims have not as yet been acted upon, $204,801.56.”
63. (a) The adjustment of $204,801.56 was a reduction of the $822,375.18 which had been set forth in Federal taxes refundable on account of refunds receivable for 1942-1947 arising from replacements in 1949 of inventories involuntarily liquidated in those years. The adjustment was made to reflect a section 722 settlement disclosed by a revenue agent’s report dated April 8, 1952.
(b) The revenue agent knew, at the time of his audit of plaintiff’s 1950 return, that the amount of $822,375.18 represented the aggregate refunds expected by plaintiff for 1942, 1943,1944,1945, and 1947 as a result of replacements during 1949 of inventories involuntarily liquidated in those years and that the item of $204,801.56 was an adjustment of such anticipated refunds. He was not under the impression that any formal claims had been filed for such refunds but he knew that the plaintiff had excess replacement costs and he expected that, in due course, formal claims based on 1949 replacements would be filed and that these would be referred to him for examination.
(c) The adjusted amount, arrived at by deducting the adjustment of $204,801.56 from the original figure of *133 $822,375.18, which, was included by the revenue agent in plaintiff’s base period capital addition, represented the total amount of refunds to which plaintiff considered it was entitled as a result of the replacements in 1949 of involuntarily liquidated inventories, and the revenue agent considered this amount to be accurate.
64. (a) The revenue agent’s report dated February 20, 1953, which was the official report of the Internal Revenue Service concerning plaintiff’s 1950 return, recognized the existence of plaintiff’s belief that it was entitled to refunds in a specified aggregate amount in respect of 1942, 1943, 1944, 1945, and 1947 arising from the replacements in 1949 of inventory involuntarily liquidated in those years.
(b) Upon completion of the audit of plaintiff’s 1950 return, the revenue agent expected the plaintiff would file formal claims for such refunds and that he would examine them.
65. In its Federal income tax returns for 1949 and 1950 filed before March 15,1953, and in the course of the audits of such returns conducted and completed before March 15,1953, plaintiff made known to the Commissioner of Internal Revenue the fact that it anticipated refunds for 1942, 1943, and 1945 based upon replacements in 1949 of inventories that had been involuntarily liquidated in those years.
66. The revenue agent who audited plaintiff’s Federal income tax returns for 1949 and 1950 knew prior to March 15, 1953, of the existence of plaintiff’s expectation of refunds referred to in paragraph 65. His reports dated August 11, 1952, and February 20,1953, covering the audits of plaintiff’s 1949 and 1950 returns, respectively, reflected the existence of said expectation.
67. Plaintiff filed formal claims for refund on Internal Revenue Service Form 843 on May 22, 1953, for overpay-ments of income taxes for 1942 and 1943 and excess profits taxes for 1945, and on January 27, 1954, for overpayments of income taxes for 1945. All of the refunds claimed were based upon the excess cost of replacements made in 1949, among other years, of inventories that were involuntarily liquidated in 1942, 1943, and 1945. It was in these formal claims that the plaintiff first made a formal demand for *134 refunds for 1942, 1943, and 1945 based on 1949 replacement costs, and formally advised the Revenue Service of (a) the amount of the excess replacement costs in 1949 with respect to inventory involuntarily liquidated in 1942, (b) the amount of the 1949 replacement costs, (c) the amount of the 1942 liquidation costs, and (d) similar amounts with respect to inventory involuntarily liquidated in 1943 and 1945 and replaced in 1949. These amounts were as follows:

Without knowledge of these amounts, refunds based on 1949 replacements could not be computed or verified. The claims, which were forwarded to the Internal Revenue Service by letters identifying them as claims for refund, made no reference to a previous filing of informal claims based on 1949 replacements.
68. The formal claims on form 843 in respect of income and excess profits taxes for 1945 were filed within 2 years of the payment by plaintiff on June 12, 1952, of income taxes for the year 1945 and interest thereon aggregating $493,642.61, of which at least $406,422.66 represented income taxes.
69. Plaintiff’s refund claims for 1942,1943, and 1945 were formally examined before March 3,1954, by the same revenue agent who audited plaintiff’s Federal income and excess profits tax returns for 1940-1950.
70. The revenue agent made a thorough examination of said claims, including verification of the amount asserted by plaintiff as the excess cost of replacements in 1949. Such verification involved a considerable amount of work. The introduction to the revenue agent’s report of his examination contains the following statement:
Claims for refund, filed May 21, 1953, covering the years 1941, 1942,1943, 1944, 1945, 1946, 1947, and 1950, in connection with replacements of inventory involuntarily liquidated have been acted upon in this report.
*135 71. On March 3, 1954, the revenue agent, who, at the time of the examination, was unaware of the fact that there was a statute of limitations pertaining to claims based on excess replacement costs, recommended allowance of refunds to plaintiff for 1942,1943, and 1945.
72. The revenue agent’s report recommending allowance of refunds to plaintiff was reviewed during 1954 by the agent’s supervisor or group chief and approved without invoking the statute of limitations.
73. Early in 1955, the Post-Audit Review Section of the Internal Revenue Service determined that the claims referred to in finding 67 were not timely filed insofar as they were based on excess replacement costs incurred in 1949, and the claims were formally rejected on that ground on October 15, 1958; on the same date, refunds for 1942,1943, and 1945 were allowed for replacements made in years other than 1949.
74. By April 1, 1955, plaintiff learned that the claims referred to in finding 67 were to be disallowed as untimely insofar as they were based on 1949 replacement costs. Although plaintiff’s representatives made numerous statements to representatives of the Internal Revenue Service of its intention to pursue the matter on the theory of an informal claim, plaintiff filed no formal protest to this detemination and it was not until July 1959 that the plaintiff, by the filing of the petition in this case, formally advised the Government of its contention that timely informal claims based on 1949 replacement costs had been filed.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on September 13,1963, that judgment for the plaintiff be entered for $464,351.76, without interest.

 Section 22(d) (6) provides in pertinent part:
(6) Involuntary liquidation and replacement of inventory.
(A) Adjustment of net income and resulting tax. — Years beginning prior to January 1, 19/tS. If, for any taxable year beginning after December 31, 1940, and prior to January 1, 1948, tbe closing inventory of a taxpayer inventorying goods under tbe method provided in this subsection reflects a decrease from tbe opening inventory of such goods for such year, and if tbe taxpayer elects, at such time and in such manner and subject to such regulations as tbe Commissioner with tbe approval of tbe Secretary may prescribe, to bave tbe provisions of tbis paragraph apply, and if it established to tbe satisfaction of tbe Commissioner, in accordance with such regulations, that such decrease is attributable to tbe involuntary liquidation of such inventory as defined in subparagraph (B), and if tbe closing inventory of a subsequent taxable year, ending prior to January 1, 1953, reflects a replacement, in whole or in part, of the goods so previously liquidated, tbe net income of the taxpayer otherwise determined for tbe year of such involuntary liquidation shall be adjusted as follows :
(i) Increased by an amount equal to tbe excess, if any, of tbe aggregate cost of such goods reflected in tbe opening inventory of the year of involuntary liquidation over the aggregate replacement cost; or
(ii) Decreased by an amount equal to tbe excess, if any, of tbe aggregate replacement cost of such goods over the aggregate cost thereof reflected in tbe opening inventory of tbe year of the involuntary liquidation.
The taxes imposed by this chapter and by chapter 2 for tbe year of such liquidation, for preceding taxable years, and for all taxable years intervening between the year of liquidation and tbe year of replacement shall be redetermined, giving effect to such adjustments. Any increase in such taxes resulting from such adjustments shall be assessed and collected as a deficiency but without interest, and any overpayment so resulting shall be credited or refunded to tbe taxpayer without interest.
(B) Definition of involuntary liquidation. Tbe term “involuntary liquidation”, as used in tbis paragraph, means tbe sale or other disposition of goods *109 inventoried under the method described in this subsection, either voluntary or involuntary, coupled with a failure on the part of the taxpayer to purchase, manufacture, or otherwise produce and have on hand at the close of the taxable year in which such sale or other disposition occurred such goods as would, if on hand at the close of such taxable year, be subject to the application of the provisions of this subsection, if such failure on the part of the taxpayer is due, directly and exclusively, (i) to enemy capture or control of sources of limited foreign supply; (ii) to shipping or other transportation shortages ; (iii) to material shortages resulting from priorities or allocations; (iv) to labor shortages; or (v) to other prevailing war conditions beyond the control of the taxpayer.
(0) Replacements. If, in the case of any taxpayer subject to the provisions of subparagraph (A), the closing inventory of the taxpayer for a taxable year, subsequent to the year of involuntary liquidation but prior to the complete replacement of the goods so liquidated, reflects an increase over the opening inventory of such goods for the taxable year, the goods reflecting such increase shall be considered, in the order of their acquisition, as having been acquired in replacement of the goods most recently liquidated (whether or not in a year of involuntary liquidation) and not previously replaced, and if the liquidation was an involuntary liquidation shall be taken into purchases and included in the closing inventory of the taxpayer for the year of replacement at the inventory cost basis of the goods replaced.
(D) Election irrevocable. An election by the taxpayer to have the provisions of this paragraph apply, once made, shall be irrevocable and shall be binding for the year of the involuntary liquidation and for all determinations for prior and subsequent taxable years insofar as they are related to the year of liquidation or replacement.
(E) Adjustment in certain cases. If the adjustments specified in sub-paragraph (A) are, with respect to any taxable year, prevented, on the date of the filing of the income tax return of the taxpayer for the year of the replacement, or within three years from such date, by any provision or rule of law (other than this subparagraph and other than section 3761, relating to compromises), such adjustments shall nevertheless be made if, in respect of the taxable year for which the adjustment is sought, a notice of deficiency is mailed or a claim for refund is filed, as the ease may be, within three years after the date of the filing of the income tax return for the year of replacement. If, at the time of the mailing of such notice of deficiency or the filing of such claim for refund, the adjustment is so prevented, then the amount of the adjustment authorized by this paragraph shall be limited to the increase or decrease of the tax imposed by this chapter and Chapter 2 previously determined for such taxable year which results solely from the effect of sub-paragraph (A), and such amount shall be assessed and collected, or credited or refunded, in the same manner as if it were a deficiency or an overpayment, as the ease may be, for such taxable year and as if, on the date of the filing of the income tax return for the year of the replacement, three years remain before the expiration of the periods of limitation upon assessment or the filing of claim for refund for the taxable year. The tax previously determined shall be ascertained in accordance with section 734(d). The amount to be assessed and collected under this paragraph in the same manner as if it were a deficiency or to be credited or refunded in the same manner as if it were an overpayment shall not be diminished by any credit or set-off based upon any item, inclusion, deduction, credit, exemption, gain, or loss, other than one resulting from the effect of subparagraph (A). Such amount, if paid, shall not be recovered by a claim or suit for refund, or suit for erroneous refund based upon any item, inclusion, deduction, credit, exemption, gain, or loss, other than one resulting from the effect of subparagraph (A).

 If the replacement goods were lower-cost, the income of the liquidation year would be Increased.

 We consider only two of these grounds.

 Section 276(b) provided:
(b) Waiver. Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.
Section 275(a) provided:
(a) General rule. The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

 Section 322(b) (1) and (3) provided in pertinent part:
(b) Limitation on allowance
(1) Period of limitation, unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. If no return is filed by the taxpayer, then no credit or refund shall be allowed or made after two years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer.
*****
(3) Exceptions in the case of waivers. If both the Commissioner and the taxpayer have, within the period prescribed in paragraph (1) for the filing of a claim for credit or refund, agreed in writing under the provisions of section 276(b) to extend beyond the period prescribed in section 275 the time within which the Commissioner may make an assessment, the period within which a claim for credit or refund may be filed, or credit or refund allowed or made if no claim is filed, shall be the period within which the Commissioner may make an assessment pursuant to such agreement or any extension thereof, and six months thereafter, except that the provisions of paragraph (1) shall apply to any claim filed, or credit or refund allowed or made, before the execution of such agreement. * * *.

 As well as the time during which the Commissioner of Internal Revenue could assess further taxes for the liquidation year.

 No relevant legislative history has been offered.

 There were less explicit notations In plaintiff’s income tax return for 1950 which added to the information made available to the Service.

 Plaintiff says that the computations in the agent’s reports show that he must have known (1) the precise amount claimed for each year and (ii) the exact years in question. We need not pass upon this contention.

 We leave to the Rule 38(c) proceeding tlie parties’ dispute as to whether plaintiff has already received the $1,802.47 refund it claims with respect to 1945 income taxes.