UNITED STATES of America,
Plaintiff–Appellant,

v.

COMMERCIAL NATIONAL BANK OF
PEORIA, as Executor of the Estate of
Joseph G. O'Brien, et al., Defendants–
Appellees.

No. 87–2832.

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1988.

Decided May 10, 1989.

Linda E. Mosakowski, Asst. Atty. Gen., Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Dean B. Rhoads, Peoria, Ill., for defendants-appellees.

Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

KANNE, Circuit Judge.

The government sued the Commercial National Bank of Peoria as Executor of the Estate of Joseph G. O'Brien and as Trustee of three irrevocable trusts for the recovery of tax refunds. The government contended that the tax returns upon which the refunds were based were filed beyond the statutory period for filing claims and concluded that it was entitled to a return of erroneously refunded money. The district court concluded that the taxpayers had filed a valid informal refund claim within the statutory period and entered summary judgment in their favor. We affirm.

## I. BACKGROUND

The parties do not dispute the underlying facts of this action. In fact, they stipulated to many of the facts contained within Judge Mihm's well-reasoned order of September 8, 1987. We therefore largely adopt and reiterate the facts set forth in that order.

Joseph G. O'Brien died on February 1, 1974. Under his will and codicil, substantially all of his estate was bequeathed to three individual trusts of which his children were the beneficiaries. At the time of his death, Mr. O'Brien owned 1,315 shares of stock in the J.G. O'Brien Corporation which passed to his estate.

On November 1, 1974, Mr. O'Brien's estate filed an estate tax return which listed the 1,315 shares of stock at a value of $215.7796 per share. The return further reported that on April 2, 1973, Mr. O'Brien had gifted 2,535 shares to his children, dividing the shares equally among three irrevocable trusts for which the Commercial National Bank of Peoria served as trustee. The return also noted that he had given a total of 420 shares directly to the children in December, 1972, and January, 1973. However, the return did not include the value of any of the gifted shares in the gross estate.

On November 3, 1974, the J.G. O'Brien Corporation's directors and shareholders adopted a plan of complete liquidation to be carried out on or before June 30, 1975. Pursuant to that plan, the corporation's assets were liquidated and the proceeds were distributed to the corporation's shareholders, the estate, and the trusts.

The estate and the trusts filed tax returns reporting income based upon the distributions received pursuant to the corporation's liquidation. The basis for the shares gifted to the trusts by Joseph was reported as the basis of those shares in the hands of Mr. O'Brien because the shares had not been included in the estate for estate tax purposes. The basis of the shares held by the estate was reported at $215.7796 per share, the fair market value of the shares at Mr. O'Brien's death as reported on the estate's estate tax return. The estate and the trusts paid income taxes for the designated years based upon the gain reported in respect of liquidation of the corporation.

In September of 1976, the Internal Revenue Service issued an examination report with respect to the estate's estate tax return. The IRS's report proposed increasing the value of the corporation's shares at the time of Mr. O'Brien's death from $215.7796 per share to $288.55 per share. The estate tax examination report also stated that the gifts were made in contemplation of death. Consequently, the IRS concluded that the 2,535 shares in the corporation which Mr. O'Brien gifted to the trusts on April 2, 1973, as well as the 420 shares gifted directly to the children, should be included in the estate.

The report also proposed including in the estate, at a value of $240,000.00, certain real estate located in Madison, Wisconsin, which Mr. O'Brien had given to another trust for the benefit of his children in December of 1972. Thereafter, the IRS issued a notice of deficiency to the estate, asserting an estate tax deficiency total of $563,316.53.

In January of 1978, the estate filed a petition in the United States Tax Court seeking a redetermination of the assessed estate tax deficiency. The estate contested the proposed value of the corporation's shares, the inclusion of the shares gifted to the trusts in the estate, and the inclusion of the Wisconsin real estate in the estate.

In May of 1978, counsel for the estate and the trusts met with various representatives of the IRS to discuss potential settlement of the tax court proceedings. The IRS offered to settle the matter by splitting the Wisconsin real estate in contemplation of death issue 50/50, and by valuing the corporation's stock at $252.00 per share, a discount of 20%.

Counsel for the estate and the trusts countered the proposal, asking that all of the Wisconsin real estate be excluded from the estate and that the $120,000.00 which the IRS had been willing to concede on that issue be added to the value of the corporation's stock. This proposal would result in an increase in the agreed value of the corporation's shares to $280.10 per share. Counsel told the IRS representatives that ascribing a higher value to the corporation's shares and totally excluding the Wisconsin real estate would produce income tax benefits to the estate and the trusts. Further, counsel and the IRS representatives specifically noted that the counterproposal would result in income tax benefits to the estate and its beneficiaries, the trusts, of approximately $94,000.00 in 1976 and approximately $114,000.00 in 1975.

Following the May 10, 1978 meeting, counsel for the estate and the trusts received from the IRS proposed computations with respect to settlement. In response, counsel wrote to the IRS on June 16, 1978, indicating that certain computations received from the IRS did not reflect his understanding of the agreement which he believed had been reached at the earlier meeting. After setting forth his view of the terms of the proposed settlement, counsel stated:

> I would appreciate your doing another set of computations based on my understanding of the settlement offer. As explained, ascribing a higher value to the stock and totally excluding the Madison property will result in some income tax benefits to the estate and the beneficiaries thereof, and it is for this latter reason that we want this settlement to take the form of my proposal.

Thereafter, the IRS and the estate reached a final settlement agreement along the lines proposed in the June 16 letter. On July 5, 1978, the estate notified the tax court that a basis for settlement had been

reached. However, the IRS did not submit a proposed decision reflecting the terms of the agreement to the tax court until April of 1980, for various "administrative reasons."[1] On April 9, 1980, the tax court entered its decision, finding a deficiency in estate tax due in the amount of $331,-852.53, a substantial reduction from the $563,316.53 deficiency originally proposed.

Very shortly thereafter, the trusts submitted amended returns for the years 1975 and 1976. They sought refunds for income taxes paid upon the gains from the corporation's liquidation, basing their new calculations upon a "stepped-up" basis of $280.10 per share—the agreed basis for estate tax purposes—instead of the originally reported basis of $20.0478 per share.[2] The amended returns did not contain any reference to the fact that the statute of limitations had expired. They also did not contain any reference to the aforementioned June 16 letter in which counsel for the estate and the trusts had stated that his proposed settlement of the tax court action would result in tax benefits to the beneficiaries of the estate.

On July 18, 1980, the IRS notified the trusts that the trusts' claims for refund were disallowed. The notice recited that each claim was disallowed on the ground that a claim for refund cannot be allowed where the claim was filed more than three years after the original return was filed or two years after the tax was paid, whichever was later. The IRS apparently took no action upon the actual merits of the refund claims.

In March of 1981, the trusts again filed amended income tax returns for 1975 and 1976, and the estate also filed an amended return for 1976. The trusts sought re-

funds for the same amounts claimed in the first set of amended returns and the estate sought a refund for 1976 in the amount of $27,004.61. Attached to each of these amended returns was a statement which provided:

As I am sure you will note, the claim for refund represented by the Amended Fiduciary Income Tax Return to which this is attached is being filed more than three years subsequent to the filing of the original tax return for the period covered and more than two years after the payment of the tax for which the refund is sought. Nonetheless, the refund here claimed is not barred by the Statute of Limitations imposed by the Internal Revenue Code of 1954 (hereinafter referred to as "Code") Section 6511 for the following reasons:

(1) The application of the mitigation of the Statute of Limitations Section provided in [Code] Sections 1311–1314....

. . . .

(2) In the alternative, ... the claim for refund is timely under the doctrine of equitable recoupment....

(3) In the further alternative, the taxpayers contend that the attached letter of June 16, 1978 from this office to Appeals Officer George Bobeck ... constitutes an informal claim for refund with respect to this taxpayer.

The IRS reviewed the amended claims and in March and June of 1982 allowed refunds to the trusts and to the estate. The IRS admits that the refunds were substantially the same as the refunds which counsel for the estate and the trusts had discussed with IRS representatives in 1978.

| Taxable Year | Taxpayer | Requested Refund |
|---|---|---|
| 1975 | Michael's Trust | $33,285.77 |
| 1976 | Michael's Trust | $25,982.14 |
| 1975 | Maureen's Trust | $33,669.65 |
| 1976 | Maureen's Trust | $22,698.34 |
| 1975 | Judy's Trust | $19,379.85 |
| 1976 | Judy's Trust | $ 4,094.45 |

The requested amounts almost mirror the amounts which counsel for the estate and the

1. Apparently, the settlement calculations were being held in the Audit Section of the IRS's Chicago Appeals Office. Counsel for the estate and the trusts sent his proposed stipulation to the IRS in early August of 1979. However, the IRS did not submit the proposed decision to the tax court for nine months because of "personnel changes."

2. The returns requested the following refunds:

Nevertheless, the IRS later re-examined the refund claims filed by the trusts and the estate and determined that the amounts refunded pursuant to those claims were erroneous. Despite the language of the claims which placed the IRS upon notice that a statute of limitations issue existed, the IRS apparently realized for the first time that the amended returns were filed more than three years from the date of the original returns for each year they were filed, and more than two years from the time the tax relative to such years was paid. Accordingly, on March 7, 1984, pursuant to sections 7402 and 7405 of the Internal Revenue Code, the government instituted four suits in district court against the trusts and the estate for the recovery of erroneous refunds of federal income taxes and interest.

After the four cases were consolidated, the taxpayers filed a motion for summary judgment. They argued that the IRS could not prove that they had failed to file a timely "informal" refund claim. The IRS replied that it did not dispute the taxpayers' version of the facts but that as a matter of law the June 16, 1978 letter could not qualify as a valid informal refund claim. Consequently, the IRS believed that it was entitled to summary judgment. The district court granted the taxpayers' motion for summary judgment and denied the government's cross-motion for summary judgment.

The court first noted that it had "no way of knowing the specific reasons" why the IRS eventually granted the taxpayers' refund claims since the untimely formal refund claims—filed immediately prior to the IRS's decision—informed the IRS that the accompanying formal claim in fact was untimely, but suggested three possible theories which nevertheless entitled the taxpayers to refunds, including (1) the mitigation provisions of the Code, (2) the doctrine of equitable recoupment, and (3) the June 16, 1978 letter was a valid informal refund claim. Nevertheless, the court believed

that "[t]he presumption is very strong that the IRS considered the merits of the claims and granted the refunds, in effect treating the June 16, 1978 letter as a timely filed informal claim and, thus, waiving their requirement for filing a formal claim." The court concluded that the taxpayers had "met the burden of showing that the IRS waived its formal requirements for filing a refund claim" and entered judgment upon behalf of the taxpayers. On appeal, the IRS challenges the district court's legal conclusions.

## II. DISCUSSION

█ In an action to recover an erroneous refund brought pursuant to 26 U.S.C. § 7405, the government bears the burden of proof. *Soltermann v. United States,* 272 F.2d 387 (9th Cir.1959); *United States v. Wood,* 79 F.2d 286 (3d Cir.1935). The government admits that to prevail below it was required to prove: (1) that a refund was paid to the taxpayers, (2) the amount of the refund, (3) that the government's recovery action was timely, and (4) that the taxpayers' refund claims were untimely. The parties do not dispute the IRS's ability to prove the first three elements. However, we must decide whether the district court properly determined that the IRS cannot satisfy the fourth element because the taxpayers filed a timely and valid informal refund claim.[3]

This case appears to us to represent a situation where a taxpayer's "claim for refund [was] contingent or uncertain in amount" and would not "ripen" or "vest" until after the statute of limitations had expired. *See, e.g., Swietlik v. United States,* 779 F.2d 1306, 1307 (7th Cir.1985). Our characterization of this case is supported by the government's argument that the taxpayers did not have an "enforceable right" to a refund until after the stock's basis was formally adjusted as part of the estate tax litigation settlement, after the statute of limitations had expired. Appel-

---

trusts apparently discussed with the IRS's representatives, evidenced by counsel's notes taken during the course of the ongoing negotiations.

**3.** As we discussed in *Vishnevsky v. United States,* 581 F.2d 1249, 1251–52 (7th Cir.1978), a distinc-

tion exists between failing to file any claim at all during the statutory limitations period and filing a general claim during that period which is later amended to provide more specific information.

lant's Brief at 19 n. 8 (discussing the government's duty to file a suit to recover an erroneous refund within two years of when the taxpayer had an enforceable right to the refund). Ordinarily in such cases, we advise taxpayers to file a conditional or protective refund claim or a request for an extension of the statute of limitations to avoid potential statute of limitations problems. *See id.; O'Brien v. United States,* 766 F.2d 1038, 1041 n. 3 (7th Cir.1985) (involving a dispute between one of the beneficiaries of the trusts involved in this case and the same facts and circumstances, but not involving an informal refund claim theory of the case); *but see Chertkof v. United States,* 676 F.2d 984 (4th Cir.1982) (rejected by *Sweitlik* and *O'Brien*). Unfortunately, the taxpayers in this case did not file any "formal protective documents" during the limitations period.

Nevertheless, our inquiry does not end here. As we recognized in *O'Brien,* other courts have found that under certain special circumstances a timely "informal" refund claim may serve to toll the statute of limitations until the taxpayers properly can file a formal refund request. In *O'Brien,* we commented that:

> a general notice advising the government that the taxpayer believes his taxes have been erroneously assessed, requesting a refund and indicating that the basis of the refund is in litigation, is sufficient to constitute an "informal" refund claim which may be perfected by the filing of a formal refund claim after the refund

claim limitations has expired. *United States v. Kales,* 314 U.S. 186, 194, 62 S.Ct. 214, 218, 86 L.Ed. 132 (1941); *Stuart v. United States,* 130 F.Supp. 386, 388–390, 131 Ct.Cl. 174 (1955); *Night Hawk Leasing Co. v. United States,* 18 F.Supp. 938, 941–942 [84 Ct.Cl. 596] (Ct.Cl.1937).

766 F.2d at 1041 n. 3. *See also generally Martin v. United States,* 833 F.2d 655, 660, 662–63 (7th Cir.1987) (dicta); *Arch Eng'g Co. v. United States,* 783 F.2d 190, 192 (Fed.Cir.1986); *Barenfeld v. United States,* 442 F.2d 371, 374, 194 Ct.Cl. 903 (1971); *American Radiator & Standard Sanitary Corp. v. United States,* 318 F.2d 915, 920, 162 Ct.Cl. 106 (1963).[4] The government concedes the validity of this theory, *see* Appellant's Brief at 25 n. 12, but challenges the sufficiency of the general notice, or informal refund claim, arguably provided by the taxpayers.

■ The sufficiency or adequacy of an informal refund claim is largely a question of fact. *Martin,* 833 F.2d at 661.[5] In *Martin,* we noted that even though the district court's findings do not rest upon credibility determinations and instead are based upon documentation in the record, we must give appropriate deference to the district court's findings. *Id.* at 662. Applying these principles, if we agree with the district court's conclusions regarding the sufficiency of the informal refund claim, then the refunds cannot be considered "erroneous" under 26 U.S.C.

---

**4.** In *Kales,* the Supreme Court stated:

> This Court, applying statute and regulations, has often held that a notice fairly advising the Commissioner of the nature of the taxpayer's claim, which the Commissioner could reject because too general or because it does not comply with formal requirements of the statute and regulations, will nevertheless be treated as a claim where formal defects and lack of specificity have been remedied by amendment filed after the lapse of the statutory period. [Citations omitted]. This is especially true where such claim has not misled the Commissioner and he has accepted and treated it as such.

> 62 S.Ct. at 218 (citations omitted).

**5.** In *Martin,* we addressed a taxpayer's demand for refund based solely upon an informal re-

fund filed within the statutory limitations period. We rejected his demand, finding that the informal claim was inadequate as a refund claim. However, we stated that it was not a case where the taxpayer's right to a refund was uncertain or contingent because of pending litigation and that the IRS knew that the taxpayers were entitled to, and would expect, a refund if they obtained a favorable result. 833 F.2d at 661. In fact, we expressly found that the *Kales/Stuart/Night Hawk* informal refund/amendment theory did not apply under the circumstances of that case. *Id.* at 662–63. Thus, *Martin* does not exactly address the issues presented by this case. Nevertheless, we believe that some of *Martin's* directives regarding the appropriate standard of review and the principles governing informal refund claims generally are helpful here.

§ 6514(a)(1). We thus would be forced to conclude that the government could not meet its burden of proof below and that the taxpayers may retain the refunded amounts.

What constitutes an adequate or valid "general notice" or "informal refund claim" is not well settled. The IRS Regulations only provide the framework for the filing of formal immediate refund claims. Because courts created the concept of an informal claim or notice which may toll the statute of limitations under special circumstances, no specific rules address the requirements for such notice; only general principles exist. Virtually all courts agree that a taxpayer cannot rely solely upon oral communications to preserve his right to a refund claim. Beyond that basic proposition, however, courts often vary on which elements are necessary to satisfy the requisite notice to which the IRS is entitled.

In *Martin*, we reiterated the principle that "[i]t is not enough that the IRS has in its possession information from which it might find that the taxpayer is entitled to, or might desire, a refund." *Martin*, 833 F.2d at 660 (citing *American Radiator*, 318 F.2d at 920). For example, courts generally agree that an informal refund claim "must have a written component and 'should adequately apprise the Internal Revenue Service that a refund is sought and for certain years.'" *Arch Eng'g Co.*, 783 F.2d at 192 (quoting *American Radiator*, 318 F.2d at 920); *see also Angelus Milling Co. v. C.I.R.*, 325 U.S. 293, 297, 65 S.Ct. 1162, 1164, 89 L.Ed. 1619; *Martin*, 833 F.2d at 660, 662. Beyond the writing requirement, however, an informal refund claim is exactly that—informal.

■ Although not discussed at length in *Martin*, a case not involving the exact situation presented here, a claim's written component alone need not bear the burden of satisfying the notice requirements. Different courts have stated that a court must examine the writing, or series of writings, in light of all of the existing facts and circumstances to determine whether the IRS had sufficient notice that a taxpayer wished to assert a right with regard to the overpayment of tax. *Furst v. United States*, 678 F.2d 147, 151, 230 Ct.Cl. 375 (1982) (citing *Kales*, 314 U.S. at 194, 62 S.Ct. at 218; *American Radiator*, 318 F.2d at 920–21). Furthermore, courts believe that "the writing should not be given a crabbed or literal reading, ignoring all the surrounding circumstances which give it body and content. The focus is on the claim as a whole, not merely the written component." *American Radiator*, 318 F.2d at 920 (citing *Newton v. United States*, 163 F.Supp. 614, 619, 143 Ct.Cl. 293 (1958); *Higginson v. United States*, 81 F.Supp. 254, 267–68, 113 Ct.Cl. 131 (1948)); *see also Martin*, 833 F.2d at 663 (Ripple, Circuit Judge, dissenting) ("The adequacy of this notice is especially clear when one assesses the letter in the context of the overall negotiations between the taxpayer and the Government.").

■ Applying these principles to the facts of this case is not an easy task. We agree with Judge Mihm's statement that whether the taxpayers filed an adequate informal claim "is a close question." Of course, if as the government wishes we were to focus solely upon the letter of June 16, 1978—which is the "written component" of the informal refund claim alleged filed in this case—we would be hard pressed to find that it qualified as a valid informal refund request on its own. As Judge Mihm stated, the letter does not mention the word "refund" or the specific years for which the taxpayers would receive income tax benefits. However, as the cases discussed above point out, the written component of an informal refund request need not contain magical words or contain every fact supporting that request. A taxpayer may rely upon other documents, conversations or correspondence to fulfill his notice obligations. Such is the case especially when taxpayers cannot claim an immediate refund because their right to a refund cannot vest until pending litigation is settled. *See, e.g., Stuart*, 130 F.Supp. at 389; *Night Hawk*, 18 F.Supp. at 941–42.

Contrary to the government's assertions, we believe that the June 16 letter in all respects satisfies the taxpayers' duty to issue some sort of "writing" as part of the notice requirement. The government initially asserts that informal refund claims, like formal refund claims, may be filed only on behalf of the taxpayer who is entitled to the refund. *See Rosengarten v. United States*, 181 F.Supp. 275, 279, 149 Ct.Cl. 287, *cert. denied*, 364 U.S. 822, 81 S.Ct. 60, 5 L.Ed.2d 53 (1960); *see also American Radiator*, 318 F.2d at 920 (discussing informal refund claims generally and not confronted with this particular issue); *Brigham v. United States*, 470 F.2d 571, 579 (Ct.Cl. 1972) (quoting *American Radiator* and also not faced with this issue), *cert. denied*, 414 U.S. 831, 94 S.Ct. 62, 38 L.Ed.2d 65 (1973). The government then argues that because the written component of the taxpayers' claim—again, the June 16 letter— was sent by the counsel for the estate and the trusts during the negotiation of the pending estate tax litigation, it cannot serve as a general notice of a right to a refund, or a valid informal refund claim, on behalf of the taxpayers. We reject this argument for the following reasons.

We agree that a refund "claim" must be submitted by the taxpayer who is entitled to the refund. However, we are not convinced that the "written component," as distinguished from the "claim" as a whole, must be specifically designated as correspondence from a certain entity. The district court found that from the contemporaneous and ongoing negotiations the IRS undoubtedly knew that the taxpayers here had a strong interest in the litigation and had a right to a refund once it was settled—but not before. Thus, we think that the "claim" in fact was made on behalf of the taxpayers.

 In any event, we believe the June 16 letter itself satisfies any requirement that the taxpayers themselves were required to file a written document of some sort to fulfill the notice requirement. The government admits in its briefs, and admitted in the district court below, that counsel for the estate was also counsel for the trusts. Because of the special relationship between the estate and the trusts, which were the beneficiaries of the estate, and unusual long-reaching effects of the issues involved in the estate tax litigation, counsel necessarily represented both the estate's and the trusts' interests simultaneously. If he negotiated a deal which cost the estate a certain yet-to-be-determined amount of money the additional tax would be more than offset by the trusts' refunds. Thus, the correspondence sent by counsel for the estate and the trusts to the IRS logically reflected correspondence from both entities rather than correspondence exclusively from the estate embracing matters in which only the estate had an interest.[6]

 Furthermore, the June 16 letter stated: "As explained, ascribing a higher value to the stock and totally excluding the Madison property will result in some income tax benefits to *the estate and the beneficiaries thereof,....*" The IRS undoubtedly knew that the beneficiaries of the estate were the trusts and that the trusts' rights were being asserted simultaneously with those of the estate, no matter who was actually named in the underlying litigation. Consequently, we do not believe the letter had to bear a signature which included some sort of designation such as "John Doe on behalf of the Commercial National Bank of Peoria as Trustee for the Richard Roe Trust" in order to qualify as a claim on behalf of the taxpayers, who had a substantial and known interest in the pend-

**6.** We also believe that the only case cited by the government which actually addressed the filing of a refund by a person other than the taxpayer who was entitled to the refund is inapposite. In *Rosengarten,* a claimant attempted to argue that documents and communications between the IRS and a third party which did not mention the claimant at anytime should qualify as an informal refund claim on his behalf. 181 F.Supp. at 275. Here, the undisputed evidence indicates that the IRS knew full well that once the basis of the stock was established the trusts would be entitled to refunds. In effect, the trusts were involved in the negotiations even though the litigation underlying the negotiations did not directly involve their interests. Thus, *Rosengarten* does not support the government's contentions here.

ing litigation.[7]

■ Having concluded that the written component of the taxpayers' claim possesses no fatal technical flaws, we must determine if the surrounding circumstances supply the remainder of the requisite notice. Initially, we agree with the district court that the taxpayers made an adequate "demand for refund." As we stated, the written component of the claim did not mention the word "refund." However, as long as the writing provided some evidence of their contemporaneous oral demand for a refund, it will suffice. We agree with the district court that such evidence exists, especially when judged by the standards established by the informal refund/amendment cases cited in *O'Brien.*

For example, in *Night Hawk,* the Court of Claims found that a notation on the back of a check which stated, "This check is accepted as paid under protest pending final decision of the higher courts," adequately apprised the IRS of the taxpayer's claim in light of the surrounding circumstances. Similarly, in *Stuart,* the court held that a statement in a taxpayer's "Waiver of Restriction on Assessment and Collection of Deficiency in Tax" which provided that the waiver and consent should not be construed "as barring any future claim for refund" likewise qualified as the basis of an informal refund claim. Furthermore, in *Kales,* the Supreme Court

found that a letter filed by a taxpayer protesting a proposed assessment, which included a statement that if a revaluation were made the taxpayer would claim the right to a future refund, was sufficient to toll the statute of limitations. Given these holdings and the nature of this case, we believe that the taxpayers' claim satisfies the "demand for refund" requirement.

At the time the letter was sent (within the controlling statute of limitations), the IRS and counsel for the estate and the trusts were in negotiations to settle the pending tax court litigation. Once again, the undisputed evidence below indicates that throughout the negotiations the IRS's representatives were aware that the corporation had been liquidated and that the shareholders had paid income tax on the liquidation proceeds. They further realized that the tax had been calculated using a basis in the corporation shares which was less than the valuation of the corporation shares which had been proposed by either the IRS or the counsel for the estate and the trusts. The IRS also does not dispute that it agreed throughout the discussions that, to the extent the April, 1973 gifts were included in the estate and valued at a higher amount, the estate and the trusts would be allowed to obtain tax refunds based upon the value of the shares as finally determined for estate tax purposes.[8]

---

7. The IRS also implies that the taxpayers' claims for refunds might be defective because the refunds were not the assertion of the rights to "immediate" refunds. However, later in its briefs, the government admits that "[i]t is possible, however, to have a valid formal claim for refund in the future, if at the time of filing the informal claim, the taxpayer asserts the present right to file an amended claim upon the occurrence of a specific contingency described with clarity in the informal claim. *United States v. Kales,* 314 U.S. 186 [62 S.Ct. 214, 86 L.Ed. 132] (1941)." Appellant's Brief at 25 n. 12.

We agree with the government's underlying premise, but interpret *Kales* and related cases slightly differently. As we have stressed throughout this opinion, a "claim" must provide certain information and have certain elements, not the claim's "written component." Thus, we agree with the district court that the IRS knew what the contingency was and that the taxpayers made an adequate demand, either in or contemporaneous with the claim's written com-

ponent. We therefore conclude that the taxpayers properly were "asserting a present right and expectation as to the future receipt of a tax refund." *Wall Indus. v. United States,* 10 Cl.Ct. 82, 99 (1986) (trial court).

8. The taxpayers do not claim that the IRS agreed to pay them refunds as part of a "package deal" when the estates' tax court litigation was settled. The government argues that if the taxpayers were to make such a claim then the taxpayers would be required to bring an action in the claims court to enforce that "contract." Although we need not address this issue, we believe that the taxpayers probably could have asserted such a claim in the district court, if the facts supported it, because the IRS brought this action in this particular forum and the taxpayers were merely defending against the IRS's claims, rather than asserting an affirmative breach of contract.

We conclude that the district court did not err when it found that the taxpayers adequately notified the IRS regarding the status of their right to a refund. As required by our brief analysis in *O'Brien*, and the requirements established by the informal refund/amendment cases cited and discussed above, the IRS clearly had notice of the pending litigation. More importantly, the IRS knew that the outcome of that litigation would affect the taxpayers' tax status. Thus, we are unable to hold that the circumstances surrounding the estate tax litigation failed to supply all of the information necessary to file a general notice which would serve to toll the statute of limitations until the taxpayers were entitled to file a formal refund request.[9] Nevertheless, we must address the government's remaining contentions.

■ In its briefs, the government argues that the first formal refund claim filed by the taxpayers did not mention the June 16 letter, so they obviously were not relying upon that letter to save their untimely claims. Consequently, we should overturn the district court's finding that the taxpayers' intent to assert a right to a refund throughout the negotiations was clear. Unfortunately for the government, "[i]t is irrelevant that the formal demands did not refer to the informal claim and were not designated as amendments. Whatever the nomenclature, they supplied the missing information before the Internal Revenue Service had rejected the informal claim, and were therefore equivalent to amendments in substance." *American Radiator*, 318 F.2d at 922. Consequently, the government's "failure to designate" argument must fail.[10]

■ The government next argues that the taxpayers were required to prove that the IRS acted immediately upon the notice that the taxpayers would be entitled to file formal refund requests once the stock's basis was adjusted.[11] However, the con-

---

9. The only factor which the IRS lacked which would allow it to determine whether the taxpayers were entitled to a refund at the time the informal refund claim was "filed" was the same factor which prevented the taxpayers from filing a formal refund claim during the statutory limitations period: the IRS had not yet established the "proper" basis of the liquidated stock. However, even then, the IRS admits that counsel for the estate and the trusts, during the course of the negotiations, provided the IRS with the amounts to which the taxpayers were entitled. In fact, the amounts demanded by the trusts in their subsequent formal refund requests, and ultimately refunded by the IRS, almost mirrored the representations made by the counsel for the estate and the trusts. This example is yet further evidence that the surrounding circumstances filled in any gaps which otherwise might have existed.

10. The government devotes much time to characterizing the "informal refund theory" as a seat-of-the-pants, after-the-fact argument. To support its theory of the taxpayers' case, the government states that Michael O'Brien, one of the beneficiaries of the trusts involved here, did not raise this theory when he sued for a refund and ultimately lost in this court. We believe that the IRS's contentions are immaterial to the resolution of these appeals and see no reason to address them specifically. *O'Brien v. United States*, 766 F.2d 1038, 1041 n. 3 (7th Cir.1985).

11. The government apparently is attempting to distinguish *Kales.* In that case, the Supreme Court stated that an informal refund claim may toll the statute of limitations under special circumstances. The Court then added that "[t]his is especially the case where such a claim has not misled the Commissioner and he has accepted and treated it as such." 62 S.Ct. at 218.

We do not believe that *Kales* can be distinguished solely upon that added statement. First, the law regarding informal refunds is independent of that added circumstance—that is, a court may more easily find a tolling of the statute of limitations if the IRS's acquiescence to the tolling is very clear, but such formal acceptance is unnecessary. Second, there is at least some evidence that the IRS in this case in fact accepted and treated the informal claim as sufficient to toll the statute of limitations.

Contrary to the government's assertions, acceptance and treatment need not be shown immediately following the taxpayers' filing of an informal claim. As we have stressed throughout the opinion, the IRS could not act upon the claim for the same reason that the taxpayers could not file a formal claim—information in the form of the adjusted basis was still missing. Thus, no immediate action could occur.

Furthermore, the IRS did eventually accept the informal claim. The IRS rejected the taxpayers' first formal claims, apparently without addressing their merits, because it viewed the claims as untimely. The taxpayers had not explained the nature of the proceedings, including their giving of prior general notice, apparently because they believed that the IRS's representatives understood their situation given the length

cept of an informal claim tolling the statute of limitations during the period of pending litigation or general uncertainty largely depends upon the IRS's inaction upon the informal claim until a formal claim is filed.

As the Court of Claims stated in *Stuart*, when applying the principles established by the Supreme Court in *Kales*, "[s]ince the Commissioner did not act upon or reject the informal claim for refund filed by the plaintiff ..., but held the same until the litigation of the question was terminated, the taxpayer could perfect the informal claim by the filing of a formal claim for refund." *Stuart*, 130 F.Supp. at 389; *see also American Radiator*, 318 F.2d at 921 ("An informal claim which is partially informative may be treated as valid even though 'too general' or suffering from a 'lack of specificity'—at least where those defects have been remedied by a formal claim filed after the lapse of the statutory period *but before the rejection of the informal request*." (emphasis added) (citing *Kales*, 314 U.S. at 194, 62 S.Ct. at 218)). Thus, contrary to the government's contentions, we can find no requirement that the taxpayers prove that the IRS immediately acted upon the informal claim and decided to waive the formal filing requirements. *See American Radiator*, 318 F.2d at 920 ("In addition to the writing and some sort of request for a refund, the only essential is that there be made available sufficient information as to the tax and the year to enable the Internal Revenue Service to commence, *if it wishes*, an examination into the claim." (emphasis added)).[12]

When boiled down, this case closely resembles *Stuart*, which we cited in *O'Brien*. In *Stuart*, a taxpayer consented to an assessment of a deficiency, but attached a memorandum which stated that the agreement did not bar the taxpayer's right to any future refund. After the Second Circuit held that the IRS should have allowed certain deductions to the taxpayer, the taxpayer filed an untimely formal refund claim. The IRS denied the refund. However, the Court of Claims found that the original memorandum qualified as a valid and timely informal refund claim which tolled the statute of limitations until the taxpayer amended that claim by filing a formal refund claim. The *Stuart* court stated that "[h]ad a formal claim been filed instead of the informal one which asserted the right to a refund, the ground therefore and the facts on which it was based, such formal claim would doubtless have been rejected *pro forma* and further litigation would have been necessary." 130 F.Supp. at 389.

In this case, the agreement which revalued the corporate stock was struck shortly after the June 16 letter was sent. However, because of "admininstrative reasons" apparently related at least in part to personnel changes within the IRS's offices,

---

and nature of the prior negotiations. However, once the taxpayers encountered problems, they immediately provided the IRS with documentation which detailed the negotiations. Thereafter, the IRS considered the merits of the taxpayers' claims, based upon the informal refund theory, and issued refunds. These circumstances arguably indicate that the IRS accepted the June 16 letter and the ongoing negotiations together as a "claim." As a result, if we found that "acceptance and treatment" were prerequisites, we easily could find those elements in this case.

Of course, like the district court, we are unable to state absolutely that the IRS granted refunds based upon the informal refund theory, the mitigation provisions of the Code, or the doctrine of equitable recoupment. However, we agree with the district court that the presumption is strong that the IRS considered the informal refund theory prior to granting the refunds. Because the IRS failed to offer any evidence to the contrary, and instead decided merely to oppose the taxpayers' motion for summary judgment on that issue using only legal arguments and the taxpayers' version of the facts, we also must assume that the refunds were based upon that theory.

12. In the district court, neither the IRS nor the taxpayers offered any evidence of why the IRS chose not to act upon the taxpayers upcoming right to a refund. The IRS now argues that it did not act because it did not recognize the "claim" as a claim. However, it is just as likely that the IRS did not act because it had not yet filed the settlement agreement with the tax court and the basis was not formally set. Consequently, the IRS did not grant refunds because it had not yet received an iron-clad promise that it would receive additional taxes from the estate.

the agreement was not formally executed until April of 1980—well over a year after the agreement was reached. Had the agreement been executed immediately after its terms were finalized in 1978, the taxpayers in the estate could have filed formal claims within the requisite statute of limitations. However, the time lapse prevented the parties from filing valid formal claims until the agreement was formally entered by the tax court in 1980—that is, the parties could not file formal refund claims because the basis of the stock had not been adjusted and no refund was yet due in 1978.

Thus, as in *Stuart*, had the trusts' filed a formal refund claim instead of the informal request, the IRS would have immediately rejected the claim as being without any basis (the IRS would not have given up refunds until it was sure that the estate would pay more taxes). In turn, the taxpayers would have had to sue for a refund when in reality they were not yet entitled to one until the tax court entered the agreement which provided that the stock had been undervalued throughout the prior transactions.[13]

We conclude that this case does not represent a case such as *Angelus Milling* in which the Supreme Court stated that it is not enough that the IRS has somewhere under its roof information which might suggest that a taxpayer might desire a refund. 65 S.Ct. at 1165. In fact, that Court never even discussed *Kales'* approval of a taxpayer's use of an amendment following the filing of an informal claim while the claim remained uncertain. Thus, we find no inconsistencies between our decision based upon the Court's decision in *Kales* and the other decisions employing similar reasoning, and the Court's later decision in *Angelus Milling*.

---

**13.** The taxpayers do not claim that the IRS in bad faith refused to submit the settlement agreement until after the statute had expired and we do not know if the facts even would support such an allegation. If they did, however, we

## III. CONCLUSION

 Giving the district court's holding "appropriate deference," we are unable to conclude that the facts and circumstances of this case dictate a reversal of the district court's decision. We believe that the taxpayers adequately demonstrated that they filed a timely informal refund claim which tolled the statute of limitations. The written component of the taxpayers' informal refund claim and the circumstances surrounding the negotiation of the pending estate tax litigation satisfied the important notice requirements. Consequently, the IRS cannot carry the burden necessary to recover "erroneous" refunds.

 We strongly hope that taxpayers faced with similar situations will heed our now explicit warning to file conditional or protective claims or requests for an extension of time if the nature or amount of their refund likely will remain unsettled until after the limitations period has expired. A decision to rely upon a "general notice" or "informal refund claim" to toll the statute of limitations may prove unwise unless the case involves extremely special facts and circumstances such as are involved here.

The district court's decision is AFFIRMED.

believe that the IRS might be precluded from bringing an action such as this one under some sort of equitable estoppel theory. Fortunately, we need not address this issue here.