**BCS FINANCIAL CORP.,
et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 94 c 2106.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 5, 1996.

---

Harvey M. Silets, Katten, Muchin & Zavis, Chicago, IL, for plaintiffs.

Ernest Yi Ling, United States Attorney's Office, Chicago, IL, Eugene J. Rossi, Kevin P. Jenkins, Christine A. Grant, United States Department of Justice, Tax Division, Washington, DC, for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On April 5, 1994, BCS Financial Corp. ("BCS") sued the United States of America ("Government"), seeking to recover a tax refund. On August 22, 1995, the Government moved to dismiss this case, and on November 15, 1995, this Court granted from the bench the Government's motion. On December 7, 1995, BCS moved for reconsideration. BCS' motion has some merit; this Court misspoke on certain issues, and it appreciates the opportunity to set the record straight with this written opinion. Nonetheless, for the reasons discussed below, this Court denies BCS' motion.

### I. Background

On November 24 and 25, 1981, BCS entered into three indemnity reinsurance agreements ("Agreements"). Pl.'s Resp. to Def.'s Mot. to Dismiss ("Pl.'s Resp.") at 2. The first Agreement had a terminable life of three years, with a ceding commission expense of $10,100,000. *Id.* The second Agreement had a terminable life of five years, with a ceding commission expense of $5,983,000. Compl. at ¶ 7; *see* Pl.'s Resp. at 2 (suggesting perhaps that it had a terminable life of three years). And the third Agreement had a terminable life of five years, with a ceding commission expense of $1,944,000. Pl.'s Resp. at 2.

On September 16, 1982, BCS filed its 1981 tax return and claimed deductions of $18,027,000 based on the Agreements' ceding commission expenses. *Id.* In 1984, BCS terminated the Agreements. *Id.* at 4. On September 15, 1985, BCS filed its 1984 tax return. *Id.* at 7.

On November 7, 1985, IRS revenue agent Harold Peterson ("Peterson") examined BCS' tax returns from 1981, 1982 and 1983. Compl. at ¶ 9. During his examination, Peterson considered disallowing on BCS' 1981 tax return part of its claimed deductions of $18,027,000, instead requiring BCS to amortize the deductions over the lives of the Agreements. Pl.'s Resp. at 3. Lawrence Friedman ("Friedman"), BCS' designated representative, argued against such an adjustment because "amortizing the expenses only affected when and in what amount—but not whether—" BCS would claim the deductions. Peterson rejected Friedman's argument. *Id.* Peterson produced three Revenue Agent Reports ("RARs") in which he proposed that BCS amortize over the lives of the Agreements. *Id.* His RARs "reflected the impact of his proposed adjustments and further that there were 'Available [Net Operating Loss] carryforwards to 1984.'" *Id.* at 4.

Subsequently, BCS appealed Peterson's proposed adjustments, prompting Peterson to produce two Form 4665 Report Transmittals ("Transmittals"). *Id.* BCS quotes a passage from each of the two Transmittals. From the one: "In 1984 the taxpayer has stated that the [Agreements] were abrogated. Any remaining unamortized balance would be allowable as a deduction in 1984." *Id.* And from the other: "The taxpayer in 1984 abrogated the agreement with the consent of the ceding company. Any costs not amortized at that time would be allowable as a current deduction." *Id.* BCS concedes, however, that Peterson's audit did not include BCS' 1984 tax year. *Id.* at 5.

IRS appeals officer Raymond Schader ("Schader") received BCS' appeal and reviewed Peterson's RARs and Transmittals. *Id.* at 5. "During the pendency of the appeal, Schader and Friedman discussed a possible settlement whereby a percentage of the ceding commission expenses would be deductible in 1981 and the remainder amortized and deducted over the lives of the Agreements." *Id.* Also, Friedman again argued that the amortization of the expenses posed a now-or-later issue, not a now-or-never one; either way, BCS "would ultimately receive deductions." *Id.*

On October 13, 1987, BCS and the IRS reached a settlement which provided that BCS could deduct 70% of the ceding commission expenses in 1981, but that it would have to amortize the remaining 30% over the lives of the Agreements. *Id.* at 6. Schader noted the settlement in his Case Management Activity Record, and the appeal division summarized the settlement's terms on Forms 5278, Statement of Income Tax Charges. *Id.* Schader then prepared three Forms 870–AD,

Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment. The Forms 870–AD "reflect[ed] adjustments to years 1977 through 1983 from the settlement." *Id.* On December 4, 1987, BCS signed the Forms 870–AD and returned them to the IRS. *Id.* On March 15, 1988, the Joint Committee on Taxation notified BCS that it took no exception to the settlement. Def.'s Mot. to Dismiss ("Def.'s Mot.") at 3.

On June 20, 1989, BCS filed Form 1120X to amend its 1984 tax return and request a refund of $817,047 based on the remaining unamortized ceding commission expenses. Pl.'s Resp. at 7. On March 30, 1992, the IRS denied BCS "otherwise valid refund" request as untimely. *Id.* BCS appealed that denial and, eventually, on April 5, 1994, brought suit in this Court.

## II. Analysis

The Government argues that BCS did not file an adequate informal claim for a tax refund. It argues that the "[BCS's] own complaint makes clear that [it] never requested a refund of any portion of [its] 1984 taxes in any writing, nor was 1984 even alluded to in all of [its] submissions to the IRS prior to the expiration of the statutory period for requesting a refund." Def.'s Mot. at 10. According to the Government, BCS "slept on [its] rights and now [is] attempting to foist on the IRS the consequences of [its] inaction." *Id.*

BCS argues that it did file an adequate informal claim. It argues that it's claim has written components, including:

[T]he three factually detailed RAR's prepared by Peterson, in part reflecting "Available NOL carryforwards to 1984"; the Form 4665 Report Transmittals reflecting that the Agreements were terminated in 1984 and that the unamortized expenses were available as valid deductions in that year; Schader's Case Management Activity Record, on which he memorialized that a settlement had been reached with BCS; the documents prepared by the IRS to summarize the terms and tax impact of the settlement on the years 1977 through 1983; and the three Forms 870 AD that were prepared by the appeals division, executed by BCS and re-

turned to the IRS to complete the settlement on the ceding commission expense issue.

Pl.'s Resp. at 11. Further, BCS argues that its claim has oral components. "It is undisputed that BCS, through Friedman, repeatedly informed both Peterson and Schader that BCS objected to the amortizations of ceding commission expenses proposed by the IRS because it was nothing more than a timing issue." *Id.* at 12. Further still, BCS argues that these written and oral components must be understood in the context of BCS's protracted settlement negotiations with the IRS, which, according to BCS, knew of "BCS' intention to claim and receive the full benefit of deductions for the … ceding commission expenses both prior to and after the IRS audit." *Id.* at 11; *see id.* at 12.

Title 26 U.S.C. § 7422(a) governs civil actions for refunds, and it provides that:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority, or any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

Title 26 U.S.C. § 6511(a) governs the limitations period for actions for refunds, and it provides in relevant part:

Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires later....

■ "Read together, the import of these sections is clear: unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund, regardless of whether the tax is alleged to have been 'erroneously,' 'illegally,' or 'wrongfully' collected, … may not be maintained 'in any

court.'" *U.S. v. Dalm*, 494 U.S. 596, 602, 110 S.Ct. 1361, 1365, 108 L.Ed.2d 548 (1989). In other words, "[a] timely, sufficient claim for refund is a jurisdictional prerequisite to a refund suit." *Martin v. U.S.*, 833 F.2d 655, 658–59 (7th Cir.1987).

"Nevertheless, ... courts have found that under certain special circumstances a timely 'informal' refund claim may serve to toll the statute of limitations until the taxpayers properly can file a formal refund request." *U.S. v. Commercial Nat'l Bank*, 874 F.2d 1165, 1170 (7th Cir.1989). Informal "claims have long been held valid." *Am. Radiator & Standard Sanitary Corp. v. U.S.*, 318 F.2d 915, 920, (7th Cir.1963); *see U.S. v. Kales*, 314 U.S. 186, 193–94, 62 S.Ct. 214, 217–18, 86 L.Ed. 132 (1941). Yet "[w]hat constitutes an adequate or valid ... 'informal refund claim' is not well settled." *Commercial Nat'l Bank*, 874 F.2d at 1171. "[N]o specific rules address the requirements ...; only general principles exist." *Id.* Consequently, courts hold that they must determine the adequacy of an informal claim on a case by case basis. *See, e.g., Donahue v. U.S.*, 33 Fed.Cl. 600, 608–09 (1995); *New England Electric Sys. v. U.S.*, 32 Fed.Cl. 636, 641 (1995) (writing that "each case must be determined based on its own unique set of facts").

Still, however, "certain standards must be met." *Martin*, 833 F.2d at 660. "Virtually all courts agree that a taxpayer cannot rely solely upon oral communications to preserve his right to a refund claim." *Commercial Nat'l Bank*, 874 F.2d at 1171. Courts generally "agree that an informal claim must have a written component and should adequately apprise the [IRS] that a refund is sought and for certain years." *Id.* (quotations omitted); *see Am. Radiator*, 318 F.2d at 920.

■ "'The basic underlying principle [of an informal claim] is the necessity to put the IRS on notice of what the taxpayer is claiming and that he is in fact making a claim for a refund.'" *Donahue*, 33 Fed.Cl. at 608, 1995 WL 385787 at *8, (quoting *Newton v. U.S.*, 163 F.Supp. 614, 618 (Ct.Cl.1958)). This principle informs the purpose of the written component. Its "primary purpose ... is in recognition of the fact that Government personnel are constantly changing, and, as such,

some continuity of notice must be provided." *New England Electric*, 32 Fed.Cl. at 644; *see Furst v. U.S.*, 678 F.2d 147, 151 (Ct.Cl.1982). "'[S]ince the written component requirement is to insure that the IRS has some memorandum in its file, it need not be a writing created by the taxpayer, but may be an internal IRS memorandum recording what the taxpayer stated he intended to do.'" *Id.* at 643–44 (quoting *Faria Corp. v. U.S.*, 1977 WL 3812 at *13, 77–1 U.S.T.C. 16,251 (Ct.Cl. Feb. 2, 1977)).

■ "[A] claim's written component alone need not bear the burden of satisfying the notice requirements." *Commercial Nat'l Bank*, 874 F.2d at 1171. "[A] court must examine the writing, or series of writings, in light of all of the existing facts and circumstances...." *Id.* Moreover, "'the writing should not be given a crabbed or literal reading, ignoring all of the surrounding circumstances which give it body and content. The focus is on the claim as a whole, not merely the written component.'" *Id.* (quoting *Am. Radiator*, 318 F.2d at 920). "[T]he written component ... need not contain magical words or contain every fact supporting that request. A taxpayer may rely on other documents, conversations or correspondence to fulfill his notice obligations." *Id.*

■ Yet "the matter set forth in the writing must be sufficient to apprise the IRS that a refund is sought and to focus attention on the merits of the dispute so that an examination of the claim may be commenced if the IRS wishes." *Martin*, 833 F.2d at 660; *see Am. Radiator*, 318 F.2d at 920. "It is not enough that the Service have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; nor is it sufficient that a claim involving the same ground has been filed for another year or by a different taxpayer." *Am. Radiator*, 318 F.2d at 920.

■ In this case, BCS offers numerous documents, or series of documents, to satisfy the written component of its claim. It offers the RARs, in which Peterson wrote that BCS had "Available [Net Operating Loss] carryforwards to 1984." The RARs are problematic because they do not indicate that the

carryforwards relate exclusively to the unamortized portion of the ceding commission expenses or that BCS sought a refund, much less that it sought one for 1984. At most, the RARs put the IRS on notice that BCS had allowable deductions in 1984 and afterward.

Next, BCS offers the Transmittals, in which Peterson wrote that any remaining unamortized balance would be "allowable as a deduction in 1984" and "allowable as a current deduction." The Transmittals cure one of the problems of the RARs because they relate exclusively to the unamortized portion of the ceding commission expenses, but they do not cure the other two problems; they do not indicate that BCS sought a refund or that BCS sought one for 1984. At most again, they put the IRS on notice that BCS had allowable deductions in 1984 and afterward.

Next, BCS offers Schader's Case Management Activity Record, in which he memorialized the settlement, and the Forms 5278, in which the IRS summarized the "impact of the settlement on the years 1977 through 1983." Pl.'s Resp. at 11. These are problematic for the same reasons that the Transmittals are problematic; they do not indicate that BCS sought a refund or that BCS sought one for 1984.

And next, BCS offers the Forms 870–AD. According to BCS, "by their own terms the Forms 870–AD ... state that when they are executed and timely returned they will constitute a formal claim for refund for any of the overassessments they reflect...." Id.; see Rev. Rul. 68–65. Yet they will constitute a claim only for the years that they cover. See Am. Radiator, 318 F.2d at 920; Donahue, 33 Fed.Cl. at 610, 1995 WL 385787 at * 10. BCS' Forms cover only the years 1982 and 1983. They do not mention 1984. So the Forms 870–AD, too, are problematic. At most, they put the IRS on notice that BCS sought a refund for a prior year, but not that BCS sought one for subsequent years, much less one for 1984 specifically.

The documents are insufficient even under a non-"crabbed" view to provide adequate notice to the IRS of BCS' alleged informal claim, but that is not dispositive of the issue because "a claim's written component alone need not bear the burden of satisfying the notice requirements." *Commercial Nat'l Bank*, 874 F.2d at 1171. This Court must consider the writings in light of all of the existing facts and circumstances. *Id.*

In this case, the facts and circumstances concern BCS' settlement negotiations with the IRS. According to BCS, "[i]t is undisputed that BCS, through Friedman, repeatedly informed both Peterson and Schader that BCS objected to the amortization of ceding commission expenses proposed by the IRS because it was nothing more than a timing issue." Pl.'s Resp. at 12. Further according to BCS, "it is undisputed that the remaining $1,776,190 of unamortized ceding commission expenses admittedly deductible in 1984 pursuant to the settlement was a readily known and calculable figure documented in the IRS files as part of the settlement." *Id.* And further according to BCS, "it is undisputed that the basis of BCS' claim for refund is the very same $1,776,190 of unamortized ceding commission expenses that were an allowable deduction in 1984 pursuant to the settlement that Schader—the *same* appeals officer who later denied BCS' claim for a refund in 1984—negotiated and concluded with BCS." *Id.*

These facts and circumstances are insufficient to cure all of the documents' problems. Perhaps they cure the one about whether BCS sought a refund. Friedman apparently told the IRS that BCS would at some point seek a deduction if not a refund based on the unamortized portion of the ceding commission expenses. Friedman stated that it was a now-or-later issue, implying that if the IRS disallowed it now, BCS would claim it later. That, however, does not cure the problem that BCS never once stated that later would be 1984. With the carryforwards, it could have been "[19]85, 86, 87, or 88. I don't know." Dep. of Schader at 64. And meanwhile, the IRS' examination encompassed only 1981 through 1983, so it had no reason to focus on 1984. BCS argues that its failing is immaterial; either way, the IRS supposedly knew what BCS intended to do. But that places an undue and improper burden on the IRS. Recall that "[i]t is not enough that the Service have in its possession information from which it might deduce that the taxpayer

is entitled to, or might desire, a refund." *Am. Radiator*, 318 F.2d at 920.

BCS argues that this case is like *Commercial Nat'l Bank*, where the taxpayers' written component did "not mention the word 'refund' or the specific years for which the taxpayers would receive income tax benefits." 874 F.2d at 1171. In that case, the IRS issued an examination report on an estate's tax return that had tax implications for the taxpayers. The IRS proposed changes to the estate's return, the taxpayers objected and the parties entered settlement negotiations. During the negotiations, the taxpayers made clear that they sought a refund, that they sought it for a certain amount and that they sought it for certain years. "The only factor which the IRS lacked which would allow it to determine whether the taxpayers were entitled to a refund ... was the same factor which prevented the taxpayers from filing a formal refund claim during the statutory limitations period: the IRS had not yet established the 'proper' basis of the liquidated stock." *Id.* at 1174 n. 9. Unlike in this case, in *Commercial Nat'l Bank* "the surrounding circumstances filled in any gaps which otherwise might have existed." *Id.* Similarly, BCS' other authority such as *Deluxe Check Printers*, 15 Cl.Ct. 175 (1988), and *Frontier Federal Savings and Loan v. U.S.*, 1992 WL 155444, 69 A.F.T.R.2d 92–1085 (E.D.Wash. Apr. 6, 1992), is distinguishable and/or unpersuasive.

This Court concludes that BCS' written offerings and their surrounding facts and circumstances do not "supply the ... requisite notice" to sustain an informal claim for a refund. *Commercial Nat'l Bank*, 874 F.2d at 1173.

### III. Conclusion

Therefore, although this Court has reconsidered the issues in this case, this Court denies BCS' motion for reconsideration and dismisses its suit for lack of subject matter jurisdiction.