2002 UT 85

**MATRIX FUNDING CORPORATION, The CIT Group/Equipment Financing, Inc., and ZCMI, Petitioners,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

No. 20000885.

Supreme Court of Utah.

Aug. 16, 2002.

Rehearing Denied Aug. 14, 2002.

Mark K. Buchi, Steven P. Young, Salt Lake City, for petitioners.

Mark Shurtleff, Att'y Gen., Mark E. Wainwright, Asst. Att'y Gen., Salt Lake City, for respondent.

HOWE, Justice:

## BACKGROUND

¶ 1 In May 1991, ZCMI planned to construct a retail store and parking garage in the Fashion Place Mall in Salt Lake County.

ZCMI approached several banks and financiers, including Matrix Funding Corporation (Matrix), to borrow funds for construction. Matrix informed ZCMI of a financing mechanism it had used in other states that could be treated as an "operating lease" for financial reporting purposes and as a loan for tax purposes. ZCMI was interested in Matrix's proposal because under generally accepted accounting principles (GAAP), ZCMI would not be required to report payments under an "operating lease" as a liability on its balance sheet. Concurrently, ZCMI would remain the legal owner of the collateral for depreciation and tax purposes.

¶ 2 Matrix requested an advisory opinion from the Utah State Tax Commission as to whether a proposed sale and leaseback transaction with an unnamed customer would be subject to Utah sales tax. On July 11, 1991, the Commission issued an advisory opinion that sales tax would be due on the lease payments made by the customer. On July 16, 1991, Matrix and ZCMI entered into a Master Lease Agreement, a Sale and Leaseback Agreement, and Equipment Schedule No. 1. The terms of these agreements were "identical, in all relevant respects" to the proposed transaction on which Matrix had sought the advisory opinion.[1] ZCMI and Matrix subsequently entered into seven additional Sale and Leaseback Agreements and executed an additional Equipment Schedule to the Master Lease Agreement on each such occasion.

¶ 3 Pursuant to the terms of the agreements, ZCMI sold property that it owned and used in its business operations to Matrix and agreed to lease the property back from Matrix. The property had been used by ZCMI for varying lengths of time, sometimes for many years prior to the sale to and leaseback from Matrix.[2] Each Sale and Leaseback Agreement set forth the purchase price to be paid by Matrix, and provided: "The parties agree that title to the Equipment shall pass from Seller [ZCMI] to Buyer [Matrix] on the Closing Date."

¶ 4 Each Equipment Schedule set the terms for leasing the equipment back from Matrix. Upon the signing of each Sale and Leaseback Agreement, Matrix made a lump-sum payment to ZCMI of between $0.4 and $3.2 million. Each lease had a term of sixty months and set forth fixed amounts for monthly rental payments, contingent rental payments, full and reduced purchase option prices, and the walk-away payment to be paid if the purchase option was not exercised. The payments required to be made were dependent upon the Consumer Price Index (CPI) as follows:

(a) If there was any increase in the CPI during the first 12 months of the lease, ZCMI's monthly lease payments would increase to the contingent rental payments for months 13 through 60. ZCMI could then exercise the purchase option at the reduced purchase option price or return the property to Matrix and pay the walk-away payment. The reduced purchase option price and the walk-away payment were equal in amount.

(b) If there was no increase in the CPI during the first 12 months of the lease, ZCMI's monthly lease payments would remain at the lower amount during the 60 month lease. ZCMI could then either exercise the purchase option by paying the full purchase option price, or return the property to Matrix and pay the walk-away payment. The full purchase option price was higher than the walk-away payment.

¶ 5 ZCMI and Matrix created the contingency in the lease payment amount in an effort to have the transaction viewed as an operational lease rather than a capital lease for financial reporting purposes. ZCMI obtained an opinion from Deloitte and Touche that the transaction qualified as an operating lease under GAAP.

¶ 6 Matrix appealed from the Commission's July 1991 advisory opinion relating to the transaction by seeking a declaratory or-

---

1. Matrix asserted this position in a petition for rehearing before this court on January 18, 1996.

2. The property included such things as noninventory furniture, equipment, Sheetrock, walls, wall coverings, paint, clothing racks, store fixtures, store displays, electrical wiring, cabinets, mirrors, light fixtures, carpet, etc.

der from the Commission. In December 1992, the Commission issued a declaratory order that the transaction would be subject to sales tax. Matrix sought review of the declaratory order under Utah Code Ann. § 78–2–2(3)(e)(ii), and we transferred the case to the court of appeals, which affirmed the Commission's order. *See Matrix Funding v. Aud. Div. of the Utah Tax Comm'n,* 868 P.2d 832 (Utah Ct.App.1994).

¶ 7 Subsequently, Matrix sought certiorari review of the court of appeals decision by this court. *Matrix Funding v. Aud. Div. of Utah State Tax Comm'n,* 912 P.2d 960 (Utah 1996). While the review in this court was pending, the Utah legislature made statutory changes to the sales and use tax statutes effective July 1, 1995, relating to sales and leaseback transactions.[3] Based on the legislative changes, and viewing Matrix's review as involving a hypothetical future transaction, this court issued a decision in January 1996, which held the case to be moot. Matrix filed a petition for rehearing in which it acknowledged to the court that "[a]ctual transactions ... have been consummated with terms that are identical, in all relevant respects with the terms of the prospective agreement." This court denied the petition.

¶ 8 While the case was pending, in a letter dated January 31, 1995, Matrix filed claims with the Commission requesting a refund of sales tax ZCMI paid and Matrix remitted from October 1991 through December 1994 in connection with the sales and leaseback transactions. At the suggestion of Matrix, action on the claims for a refund was held in abeyance pending the outcome of the case.

¶ 9 After this court issued its opinion, counsel for Matrix and ZCMI sent a letter dated November 26, 1996, to the Commission noting that Matrix was anxious to pursue its refund claim for October 1991 through December 1994. Regarding post–1994 claims, the letter stated, "In addition, we will be filing additional claims for periods after 1994." Matrix asserts that this language constituted a valid claim for taxes it paid in 1995.

¶ 10 The Taxpayer Service Division of the Utah State Tax Commission (the Division) viewed a subsequent letter sent on February 26, 1999, as the initial claim for refund for sales taxes paid by ZCMI from January 1995 through February 1999. Matrix stated that this subsequent letter was an "amended sales tax refund request" and then outlined its specific claims beginning in January 1995. The Division issued a statutory notice in response to the refund request for January 1995 through February 1999 in which all claims for 1995 were denied because the statute of limitations had run. The Division then indicated that the parties were finalizing a partial settlement that would resolve all claims for January 1996 through February 1999.

¶ 11 Matrix filed a petition for redetermination with the Commission contesting the denial of a portion of the requested refund. The Commission approved a stipulation for partial settlement in November 1999 that provided for (1) the refund of a portion of the sales tax which ZCMI had paid, amounting to $282,002.95 plus interest, which was the tax paid on lease payments related to real property and personal property located outside Utah from October 1991 through December 1994 and from January 1996 through February 1999 and (2) withdrawal of the portion of the refund claims for tax paid on lease payments related to Utah personal property for periods after the July 1, 1995, statutory change.

¶ 12 Matrix and ZCMI's remaining three claims before the Tax Commission were for sales tax paid (1) from October 1991 through December 1994 on lease payments related to Utah personal property, amounting to $227,652.71; (2) from January 1995 though

---

**3.** Section 59–12–102(22)(c) of the Utah Code outlines the current legislative scheme. This section provides that no sales tax is due on a sale and leaseback transaction where a taxpayer has paid sales tax when it initially purchased the goods, so long as two conditions are met: (1) the transaction is intended as a financing transaction and (2) the lessee capitalizes the property for finan-cial reporting purposes under generally accepted accounting principles. *Id.* The lessor is effectually barred from claiming a sales tax exemption and then treating the financing transaction as a lease for financial reporting purposes. *See* Stewart J. Beyerle, *Tax Exemptions in Sale and Leasebacks Intended as Financing Arrangements,* 7 J. Multistate Tax'n 261, 266 (Jan.-Feb.1998).

June 1995 on lease payments related to Utah personal property, amounting to $45,700.53; and (3) from January 1995 through December 1995 on lease payments related to real property and property located outside of Utah amounting to $44,472.77.

¶ 13 In September 2000, the Commission conducted a formal hearing and issued a decision denying each remaining refund request. ZCMI and Matrix now seek review of the Commission's decision.

## ANALYSIS

¶ 14 Matrix raises two issues. The first one is whether a sale and leaseback financing transaction between ZCMI and Matrix involved a "sale" for sales tax purposes under sections 59–12–102(10) and 59–12–103(1)(a) of the Utah Code for periods prior to July 1, 1995. Utah Code Ann. 59–12–102(10), – 103(1)(a) (1992). The second is whether the letter Matrix filed with the Commission on November 26, 1996, constituted a claim for a refund under section 59–12–110(2), thus tolling the statute of limitations on ZCMI's request for a sales tax refund of taxes paid in 1995. Utah Code Ann. § 59–12–110(2)(b) (1996).

## I. SALE AND LEASEBACK TRANSACTION

¶ 15 ZCMI sought capital financing from Matrix. To that end, ZCMI and Matrix entered into a Master Lease Agreement, which provided for the transfer of title of certain personal property from ZCMI to Matrix. ZCMI and Matrix executed both a Sale and Leaseback Agreement (the Agreement) and an Equipment Schedule to the Master Lease Agreement to initiate each such transaction. The Commission asserts that two transactions occurred as a result of the parties' agreements: (1) a sale of equipment from ZCMI to Matrix, and (2) Matrix's lease of the equipment to ZCMI. Sales tax in Utah is a transaction-oriented tax governed by the

Utah Sales and Use Tax Act. Within this Act, section 59–12–103(1) defines what transactions are subject to taxation:

> There is levied a tax on the purchaser for the amount paid or charged for the following:
>
> (a) retail sales of tangible personal property made within the state;
>
> . . .
>
> (k) leases and rentals of tangible personal property if the property situs is in the state, if the lessee took possession in this state, or if the property is stored, used, or otherwise consumed in this state.

*Id.* § 59–12–103(1)(a), (k) (2000).[4] Under this section, both sales and lease transactions are subject to sales tax. Matrix raises several arguments against the taxable nature of the transactions, which we address in turn.

### A. Sale Transaction

¶ 16 Determining the meaning of the word "sale" under sections 59–12–102(1), –103(1)(a) (1992) is a question of law for which this court must grant the Commission no deference, applying a correction of error standard. *Id.* § 59–1–610(1)(b) (2000).

¶ 17 A "sale" for Utah sales tax purposes is defined as

> any transfer of title, exchange, or barter, conditional or otherwise, in any manner, of tangible personal property or any other taxable item or service under Subsection 59–12–103(1), for a consideration.

*Id.* § 59–12–102(24) (2000).[5] The Commission found that ZCMI transferred title of tangible personal property under the Agreement which states, "The parties agree that title to the Equipment shall pass from the Seller [ZCMI] to the Buyer [Matrix] on the Closing Date." It is undisputed that sales tax is not imposed on this transaction since Utah Code Ann. § 59–12–104(26) (2000) exempts transactions where tangible personal proper-

---

4. Subsection (k) of this section was renumbered when section 59–12–103 underwent stylistic and punctuation changes on July 1, 2001. The quoted section above is identical to the subsection under which Matrix was taxed although numbered differently.

5. This section was previously numbered as different subsections of section 59–12–102. The changes do not affect the substance of this appeal.

ty is purchased for resale.[6] The Commission does not dispute that Matrix's purchase of the property would be for resale within the ambit of the statute since Matrix intended to lease the property to ZCMI with the option to purchase the property at the end of the lease.

¶ 18 At issue is whether title actually passed from ZCMI to Matrix under this first transaction. If title passed to Matrix, the subsequent leaseback to ZCMI would be taxable. *Id.* § 59–12–103(1)(k). If a sale transaction did not occur, ZCMI retained title and the subsequent leaseback would be in form only, not in substance, and therefore could not be taxable. Matrix urges this court to analyze whether a transfer of property occurred under the Utah Uniform Commercial Code (UUCC), which Matrix argues requires the conclusion that title to the property was not actually transferred to Matrix. The Commission asserts that because a sale occurred under the Sales and Use Tax Act, title necessarily was transferred. For the reasons set out below, we hold that we need not analyze this transfer of title issue under the UUCC.

¶ 19 In support of its argument that the UUCC must be applied to assess whether a transfer occurred, ZCMI relies on *Hales Sand & Gravel, Inc. v. Utah Tax Comm'n,* 842 P.2d 887 (Utah 1992). In *Hales,* this court was faced with the question of whether title passed at the point of shipment or at the point of delivery where there was no explicit provision in the sales agreement. *Id.* at 891–94. Applying the UUCC, this court held that "unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." *Id.* at 892 (quoting Utah Code Ann. § 70A–2–401(2) (1997)). This section describes the point at which title transfers; it does not refer to whether title has passed and is therefore inapposite to the issue at hand. Further, the parties in the case at bar "otherwise explicitly agree[d]" in the Agreement that title passed at closing. *Id.*

¶ 20 In arguing that the UUCC should govern the transaction, Matrix has failed to address a central UUCC provision. Section 70A–1–102(3), entitled "Purposes–Rules of construction," states:

> The effect of provisions of this act *may be varied by agreement,* except as otherwise provided in this act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

Utah Code Ann. § 70A–1–102(3) (1997) (emphasis added).

¶ 21 Under this section, the parties in the case at bar were free to enter into a contract inconsistent with the provisions of the UUCC, so long as the underlying obligations of good faith, diligence, reasonableness, and care were preserved and the standards in the contract not manifestly unreasonable. *See id.*

¶ 22 The Agreement states:

> 3. **Title.** The parties agree that title to the Equipment shall pass from Seller [ZCMI] to Buyer [Matrix] on the Closing Date.

The contract is clear; title passed on the closing date from ZCMI to Matrix. Matrix cannot come before us now and undo its contract by reference to the UUCC when the UUCC itself states that an agreement between the parties as to issues pertaining to the transfer of title supersedes the UUCC.

¶ 23 Matrix and ZCMI also had before them the July 11, 1991, advisory opinion that sales tax would be due on the lease payments made by ZCMI. On July 16, 1991, Matrix and ZCMI entered into a Master Lease Agreement, a Sale and Leaseback Agreement, and Equipment Schedule No. 1. The terms of these agreements were "identical, in all relevant respects" to the proposed transaction on which Matrix had sought the advisory opinion. Matrix entered the transaction understanding the potential sales tax

---

6. This section was previously numbered as different subsections of section 59–12–104. The changes do not affect the substance of this appeal.

implications. We therefore hold that title passed to Matrix from ZCMI under the clear provision of the Agreement. This sale is tax exempt, however, as a purchase for resale. Utah Code Ann. § 59–12–104(26) (2000).

## B.  Leaseback Transaction

▮ ¶ 24 Next, we must determine whether the lease transaction from Matrix back to ZCMI was taxable. Matrix emphasizes that we should analyze the leaseback transaction under the UUCC to determine whether it was a lease (true lease) or a security interest (lease intended as a security). Matrix argues that if the transaction is viewed as a lease intended as a security, ZCMI retained title and the resulting transaction is nontaxable. We disagree.

¶ 25 We begin by reviewing the applicable portion of section 59–12–103, which states:

> (1) There is levied a tax on the purchaser for the amount paid or charged for the following:
>
>> (a) retail sales of tangible personal property made within the state;
>>
>> . . .
>>
>> (k) leases and rentals of tangible personal property if the property situs is in this state, if the lessee took possession in this state, or if the property is stored, used, or otherwise consumed in this state.

*Id.* § 59–12–103. Subsection (k) requires a taxpayer to remit taxes on leases of the taxpayer's tangible personal property located within Utah. We agree with Matrix's assessment that the vital issue in this case is "whether title transferred to Matrix." We have determined that title indeed transferred to Matrix from ZCMI via the Sales and Leaseback Agreement. Having determined that it did, we find that Matrix leased certain tangible personal property located in Utah to ZCMI as described by section 59–12–103(k)

(2000). Therefore, a taxable event occurred under the Utah Sales and Use Tax Act.

¶ 26 Moreover, even if viewed as a lease intended as a security arrangement as urged by Matrix, the transaction would be subject to sales tax. In that case, there would be a sale back to ZCMI with Matrix retaining a security interest in the property. This transaction would be taxable under section 59–12–103(1)(a). A "sale" is further defined in section 59–12–102(24), which provides:

> "Sale" means any transfer of title, exchange, or barter, conditional or otherwise, in any manner, of tangible personal property or any other taxable item or service under Subsection 59–12–103(1), for consideration. It includes:
>
> . . . .
>
> (d) any transaction if the possession of property is transferred but the seller retains title as security for the payment of the price.

*Id.* § 59–12–102(24)(d). Matrix's argument assumes that if the transaction is a lease intended as a security arrangement, title necessarily remained with ZCMI throughout the transactions. However, by the terms of the Agreement, we have concluded that title passed to Matrix on the closing date. A sale had taken place at that time, but this sale was exempt from sales tax. Thus, if ZCMI held title during the course of the lease, the title necessarily was transferred back to ZCMI by Matrix through the Agreement, with Matrix retaining a security interest.

¶ 27 We agree with Matrix that further evaluation of the terms of the leaseback transaction could establish the nature of the lease, whether it is a true lease or a lease intended as security arrangement under the UUCC. This evaluation would determine whether the resulting lease is an operating lease or a capital lease for financial reporting purposes.[7] Here, we need not make such a

---

7. One commentator has described the impetus for this sort of arrangement when he stated, "The basic drives of man are few: to get enough food, to find shelter and to keep debt off the balance sheet." Richard Green, *The Joys of Leasing,* Forbes, Nov. 24, 1980, at 59; *see also Unocal Corp. v. Kaabipour,* 177 F.3d 755, 765 (9th Cir. 1999) ("The entire point [of this type of arrange-

ment] is that it is treated as an operating lease for accounting purposes, but is otherwise regarded by virtually all concerned, including the government, as a secured loan."). A true lease under UUCC guidelines will generally be classified as an "operating lease" for financial operating purposes, and a lease intended as security will generally be classified as a "capital lease"

distinction because the same amount of tax is payable on both true leases and leases intended as security. Addressing this issue, the court of appeals stated:

> The leaseback transaction from Matrix to Customer is, however, subject to sales tax regardless of whether it is a true lease or a lease intended as security. If the leaseback transaction is a true lease, it is clearly subject to sales tax under Utah Code Ann. § 59–12–103(1)(k) which levies a tax on "leases and rentals of tangible personal property."
>
> If the leaseback transaction is a lease intended as security, it is subject to sales tax as a sale from Matrix to Customer under Utah Code Ann. § 59–7–102(10)(e) (1992).

*Matrix Funding v. Utah State Tax Comm'n,* 868 P.2d 832, 834 (Utah Ct.App.1994). We adopt the rationale of the court of appeals and hold that because title transferred from ZCMI to Matrix, the subsequent transaction was either a true lease or a lease intended as security, both of which are taxable transactions.

### C. Treatment of Sales and Leaseback Agreements as Non–Taxable Financing Arrangements

¶ 28 Matrix urges this court to ignore the form of the Agreement and hold that the substance of the transactions at issue is nontaxable financial arrangements. For support, Matrix cites cases from other states that have held that because the substance of a leaseback transaction was not a lease but a secured transaction, it should not be taxable.[8] Approximately twenty states have addressed whether sale and leaseback agreements are subject to sales tax.[9] At least three states,

Minnesota, Arizona, and Indiana, have made decisions that closely follow the approach taken by the Commission and the court of appeals.

¶ 29 In *Midwest Federal Savings & Loan Ass'n v. Commissioner of Revenue,* 259 N.W.2d 596 (Minn.1977), the Minnesota Supreme Court recognized two distinct transactions in a sale and leaseback similar to those in the instant case and held that the lease was subject to use tax. Midwest agreed to sell its equipment to NCR and simultaneously execute a lease agreement under which the equipment would be leased back to Midwest. Refuting Midwest's argument that assessing the use tax would result in double taxation, and concluding that two transactions had occurred under the sale and leaseback agreement, the Minnesota court stated:

> No tax was paid on the sale of the equipment to NCR, since it was located in New York. The use tax imposed by the commissioner is based on the lease of the equipment to [Midwest], the third of three distinct transactions.

*Id.* at 599. The three transactions found by the court were: (1) Midwest's original acquisition of the equipment; (2) NCR's purchase of the equipment under the sale and leaseback agreement; and (3) Midwest's lease of the equipment from NCR pursuant to the sale and leaseback agreement. *Id.*

¶ 30 Likewise, in *Monarch Beverage v. Department of State Revenue,* 589 N.E.2d 1209 (Ind.Tax 1992), the Tax Court of Indiana held that three distinct transactions occurred among three parties: Hackney, Monarch, and Gelco. According to the agreement, Monarch was to purchase trucks from Hackney and then enter into a sale and leaseback

---

for financial reporting purposes. Matrix and ZCMI incorporated contingency provisions relating to the lease payments based on the CPI into the Agreement in an attempt to have the leases viewed as leases intended as security under the UUCC and "operating leases" for financial reporting purposes.

**8.** Matrix also cites *Board of Equalization of Salt Lake County v. First Security Leasing,* 881 P.2d 877 (Utah 1994), extensively for the proposition that the substance of the transaction was a lease intended as a security interest as opposed to a true lease. *See* Utah Code Ann. § 70A–1–

201(37). We need not analyze this case because we determined above that a transfer of title occurred. *Id.* § 59–12–102(24)(d). That is, having addressed and confirmed the Commission's finding that title transferred from ZCMI to Matrix, a subsequent lease or security interest would be a taxable transaction. *See* ¶ 35.

**9.** A somewhat comprehensive listing is provided in Beyerle, *Tax Exemptions in Sale and Leasebacks Intended as Financing Arrangements,* 7 J. Multistate Tax'n 261 (1998).

agreement with Gelco whereby Gelco would purchase the trucks from Monarch. Gelco would then lease the trucks back to Monarch. The court rejected the argument that Matrix asserts in this case, that only one transaction occurred in substance. The court held that "[s]ales and use taxes are transactional taxes imposed upon the gross income received from a retail transaction. Therefore, sales or use tax can be collected more than once on the same item if the item is the subject of more than one nonexempt retail transaction." *Id.* at 1214 (citations omitted).

¶ 31 The court in *Monarch* reasoned that the sale from Hackney to Monarch was taxable. The court also held that the leaseback of the equipment by Monarch from Gelco was taxable. Only the sale of the equipment by Monarch to Gelco was exempt from taxation since Gelco purchased the equipment to lease it back to Monarch. *Id.* at 1214 n. 14.

¶ 32 In *Honeywell Bull, Inc. v. Arizona Department of Revenue,* Ariz. Bd. Tax.App. No. 646–89–S, January 23, 1990, the tax court of appeals found two transactions in a sale and leaseback agreement. In *Honeywell,* Blue Cross of Arizona entered into an agreement wherein Blue Cross sold its computer to CAR and CAR leased the equipment back to Blue Cross. The Arizona Department of Revenue determined that two transactions occurred: (1) Blue Cross's sale of the computer to CAR, and (2) the leaseback of the computer by Blue Cross. The *Honeywell* court rejected the taxpayer's argument that it intended the agreement to be one transaction, stating that such an argument was not a "sufficient basis" to justify treating it as a single transaction. *Id.*

¶ 33 Similarly, we reject Matrix's contention that the substance of the transaction before us should be viewed as a nontaxable financing transaction for sales tax purposes. Certainly, for GAAP purposes, Matrix intended the transaction to be viewed as an operating lease, which would not require disclosure as a liability on ZCMI's balance sheet. The application of our tax laws is not, of course, subordinate to GAAP principles. Still, when a party structures a transaction to conform to GAAP in an effort to meet a particular accounting objective, that party should not be permitted to recast the form, substance, and intention of the transaction for sales tax purposes. Accordingly, we conclude that sales tax should be assessed on the transaction outlined in the Agreement.[10]

## II.  EFFECT OF STATUTE OF LIMITATIONS ON 1995 CLAIMS

■ ¶ 34 On November 26, 1996, Matrix sent a letter to the Commission referencing prior refund claims for October 1991 through December 1994. The letter also states, "[W]e will be filing additional claims for periods after 1994." Matrix contends that this letter alerted the Commission to a forthcoming claim for 1995 and should therefore toll the statute of limitations. Determining the meaning of the word "claim" under section 59–12–110(2)(b) is a question of law for which this court grants the Commission no deference, applying a correction of error standard. Utah Code Ann. § 59–1–610(1)(b) (2000). The relevant statute provides:

> Except as provided in Subsection (2)(c) or Section 19–2–124, a taxpayer shall file a claim with the commission to obtain a refund or credit under this Subsection (2) within three years from the day on which the taxpayer overpaid the tax, penalty, or interest.

§ 59–12–110(2)(b) (2000). Under this section, a refund may be obtained from the Commission if a claim is filed within three years from the date of payment. The Commission asserts that the language in the November 26, 1996, letter clearly and unambiguously signals Matrix's intention of filing subsequent claims for periods after 1994 but that the letter itself does not purport to constitute a claim for 1995.

10. We recognize that other courts disagree as cited by Matrix, but these cases are not binding, and we do not find their analysis persuasive. *In re Sherwood Diversified Serv., Inc.,* 382 F.Supp. 1359 (S.D.N.Y.1974); *Cedars–Sinai Med. Ctr. v. State Bd.,* 162 Cal.App.3d 1182, 208 Cal.Rptr. 837 (1984); *Footpress Corp. v. Strickland,* 242 Ga. 686, 251 S.E.2d 278 (1978); *Transamerica Leasing Corp. v. Bureau of Rev.,* 80 N.M. 48, 450 P.2d 934 (App.1969); *Bullock v. Citizens Nat'l Bank of Waco,* 663 S.W.2d 923 (Tex.Ct.App. 1984).

¶ 35 We have not heretofore addressed what constitutes a "claim for refund" under the Sales and Use Tax Act. In support of its argument that its letter was sufficient to meet the demands of the statute of limitations in section 59–12–110(2)(b), Matrix refers to an "informal claims doctrine" as used in *United States v. Kales*, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941). In *Kales*, a taxpayer sent a letter to the IRS challenging a stock revaluation. In the letter, the taxpayer stated that " 'if for any reason a revaluation shall be had' she ... 'will claim the right to a refund of the excess tax collected.' " *Id.* at 190, 62 S.Ct. 214. A revaluation subsequently occurred and the taxpayer filed a formal claim after the statute of limitations had run. The Supreme Court noted, "This Court ... has often held that a notice fairly advising the Commissioner of the nature of the taxpayer's claim," will be treated as a claim, where formal defects and lack of speci-

ficity have been remedied by amendment filed after the lapse of the statutory period." *Id.* at 194, 62 S.Ct. 214. The court noted that the facts of the situation were well known to the IRS and that the "claim" gave the IRS notice that the taxpayer was setting forth her right to a refund. *Id.* The court also stated that the "use of the future tense in stating a claim may, with due regard to the circumstances of making it, rightly be taken as an assertion of a present right." *Id.* at 195, 62 S.Ct. 214.

¶ 36 The *Kales* line of reasoning has been followed in subsequent federal cases.[11] Although Matrix has outlined the *Kales* line of cases in its brief, it has not addressed the effect of subsequent IRS regulations and cases interpreting the regulations that weaken the holding in *Kales*.[12] Matrix's claim that only notice of a potential future claim is necessary under federal law is therefore not wholly accurate.[13]

**11.** *See United States v. Commercial Nat'l Bank*, 874 F.2d 1165, 1171 (7th Cir.1989) (holding letter constituted claim where it stated that "excluding the Madison property will result in some income tax benefits to the estate"); *Crenshaw v. Hrcka*, 237 F.2d 372, 373 (4th Cir.1956) (holding letter put IRS on notice where letter states that "it is our intention as soon as the entire amount is paid to file claims for refund for what amounts we consider proper"); *American Radiator & Standard Sanitary Corp. v. United States*, 162 Ct.Cl. 106, 318 F.2d 915, 920 (1963) (holding reference to refund on filed tax schedule constituted sufficient informal claim); *Stuart v. United States*, 131 Ct.Cl. 174, 130 F.Supp. 386, 388–90 (Ct.Cl.1955) (holding valid claim existed where taxpayer wrote on waiver that his signature on waiver should not be construed as "barring any future claim for refund"); *Cumberland Portland Cement Co. v. United States*, 122 Ct.Cl. 580, 104 F.Supp. 1010, 1013–15 (1952) (holding claim valid where letter stated that "it is very desirable that a prompt settlement be made in this matter of over assessment"); *Night Hawk Leasing Co. v. United States*, 84 Ct.Cl. 596, 18 F.Supp. 938, 941–42 (1937) (holding check constituted claim where taxpayer wrote on back, "This check is accepted as paid under protest pending final decision of the higher courts."). Only one state has applied the informal claims doctrine to a state tax case. *Director of Rev. v. Milford Fertilizer Co.*, 539 A.2d 193 (Del.1988).

**12.** Treasury Regulation § 301.6402–2(b) requires that a claim for a refund "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprize the Commissioner of the exact basis thereof." 26 C.F.R. 301.6402–2(b)(1) (2001). Interpreting these rules, the

Tenth Circuit recently set forth the jurisdictional requirement for a court to maintain a tax refund suit:

> Under these rules, if the taxpayer does not adequately raise an issue at the administrative level, the courts have no jurisdiction to consider the issue in a later suit for refund. These requirements serve to apprise the Internal Revenue Service of the nature of the claim and its underlying facts, so that it can make a thorough administrative investigation and determination, correct any errors, and " 'limit the scope of any ensuing litigation to those issues which have been examined and which [it] is willing to defend.' ".... It is not enough that in some roundabout way the facts supporting the claim may have reached the attention of the Internal Revenue Service.

*True v. United States*, 190 F.3d 1165, 1171–72, 1173 (10th Cir.1999) (citations omitted). The Tenth Circuit has also recognized that "these rules are nonwaivable jurisdictional requirements." *In re Graham*, 981 F.2d 1135, 1138 (10th Cir.1992); *see also United States v. Dalm*, 494 U.S. 596, 601–02, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990) (discussing relevant federal IRS statutes). These cases illuminate the current status of what constitutes a claim in the federal realm.

**13.** Several federal appellate courts have cited Treasury Regulation § 301.6402–2(b) and held that the claims were untimely or too ambiguous. *See Salyersville Nat'l Bank v. United States*, 613 F.2d 650, 651 (6th Cir.1980) (citing regulation and holding that "plaintiff is barred from relying on any basis for relief not raised in its claim for a refund"); *Union Mut'l Life Ins. v. United States*,

¶ 37 Section 59–12–110(2)(b) requires that the taxpayer file a claim for a refund. In absence of Commission rules or legislation to the contrary, we hold that Matrix's interpretation of the informal notice accepted in *Kales* is insufficient to be deemed a claim for purposes of section 59–12–110(2)(b). Matrix's letter to the Commission stated that "we will be filing additional claims for periods after 1994." This letter does not indicate to the Commission presently asserted grounds for refund, nor does it advise the Commission of the specific nature of Matrix's claim. Indeed, the purported informal claim refers only to the year for which it will be filing for a refund at some future point. We hold that the language in this letter does not contain sufficient grounds upon which a refund can be claimed and the facts presented in the letter did not apprise the Commission of the basis of the refund claim. Because the November 1996 letter did not constitute a sufficient claim, it did not toll the statute of limitations which ran in 1999, and plaintiffs' 1995 claims are therefore barred.

570 F.2d 382, 393 (1st Cir.1978) (reasoning that failure to mention alternative ground for recovery in initial claim renders alternative claim unavailable at trial); *Sappington v. United States,* 408 F.2d 817, 819 (4th Cir.1969) (holding that failure to comply strictly with regulation, including filing a timely, unambiguous claim, bars recovery); *United States v. Henderson Clay Prods.,* 324 F.2d 7, 17 (5th Cir.1963) (stating that " 'the principal requirement of the statute . . . and regulations . . . is that the Commissioner be apprised by the timely filing of a claim of the exact basis upon which the claim for refund is predicated' ").

## CONCLUSION

¶ 38 We affirm the decision of the Commission that the sale and leaseback transaction between ZCMI and Matrix is taxable. Further, Matrix's refund claims for 1995 are barred by the statute of limitations.

¶ 39 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Judge NEHRING concur in Justice HOWE's opinion.

¶ 40 Having disqualified himself, Justice RUSSON does not participate herein; District Judge RONALD E. NEHRING sat.